RHODE ISLAND HOSPITAL TRUST CO., Executor and Trustee *vs.* WILLIAM T. PECKHAM *et al.*

JULY 2, 1919.

PRESENT: Parkhurst, C. J., Sweetland, Vincent, Stearns, and Rathbun, JJ.

*(1)   Wills.   Intention.   Extraordinary Dividends.*

The expressed intention of a testator in his will as to the disposition of extraordinary dividends, governs.

*(2)   Wills.   Ordinary and Extraordinary Dividends.*

Ordinary dividends, regardless of the source whence, or the time when the fund was accumulated, go to the life tenant.

*(3)   Wills.   Trusts.   Capital Assets.   Life Tenant and Remainderman.*

Capital assets in liquidation are capital, and not income, as between life tenants and remaindermen.

*(4)   Trusts.   Extraordinary Dividends.   Life Tenant and Remainderman.*

Where a stock dividend was declared against surplus accumulated before the death of testator, and instead of distributing the stock among the stockholders the corporation sold it and distributed the cash received in the form of extraordinary cash dividends, such dividends go to the *corpus* of the trust and not to the life tenants.

BILL IN EQUITY by trustee seeking instructions.

RATHBUN, J.     This is a bill in equity seeking instruction brought by the complainant as executor and trustee under the will of Fenner H. Peckham, Jr., to determine whether certain dividends should be paid as income to the life tenants under the terms of said will or added to the principal of the trust estate for the benefit of the remaindermen.

A guardian *ad litem* was appointed to represent the interest of the three minor children of William T. Peckham,

deceased, and the interests of all persons not in being and ascertainable having any interest in the subject matter, and has filed his answer submitting the interests of his wards to the care of the court. The respondent, Charles F. Peckham, and the administrator of the estate of William T. Peckham, have answered, admitting the facts. The bill was taken *pro confesso* as to the remaining respondents.

Fenner H. Peckham, Jr., died on the 25th day of December, 1915, leaving a will wherein he devised to the complainant in trust the residue of his estate. The material provisions of the trust are as follows: "The remainder of the net income of this trust estate shall be paid over quarterly by my said Trustee, one-third ($\frac{1}{3}$) to my wife, Mary Carpenter Peckham, two-ninths ($\frac{2}{9}$) to my son, Charles F. Peckham, two-ninths ($\frac{2}{9}$) to my daughter Alice Peckham and two-ninths ($\frac{2}{9}$) to my son, William T. Peckham; or in the event of the death of any of my said children, the issue of any deceased child is to take that portion of the income which his, her or their parent would have taken, if living." And after providing for the disposition of said income upon certain other contingencies, none of which have occurred, the testator directed that upon the decease of the survivor of his said three children, "all of said trust estate shall be divided among my heirs-at-law, in accordance with the Statute then in force in the State of Rhode Island, in the case of persons dying intestate, and said trust shall thereupon cease and determine."

On the testator's death, he was the owner of two hundred and seventeen shares of the common stock of the Hope Webbing Company, a Rhode Island corporation. These shares became part of the residuary trust estate. They were not specifically mentioned in the will.

On May 17, 1917, while the trust was in operation, and during the progress of the life estate, the Hope Webbing Company submitted to its stockholders a tentative plan for what was called a "re-organization of the capitalization of your Corporation." On May 25, 1917, a Massachusetts corporation was formed bearing the same name and having

the same number of shares of authorized common capital stock as the said Rhode Island corporation. On the same day—May 25, 1917—all the assets of the Rhode Island corporation were sold and transferred, as a going concern, to the new Massachusetts corporation, in consideration of the assumption by the Massachusetts corporation of all the liabilities of the Rhode Island corporation and of the transfer to the Rhode Island corporation of all of the common stock of the Massachusetts corporation,—the Massachusetts corporation, however, retaining the right to issue preferred stock to the amount of $750,000. On the same day it was agreed that the Massachusetts corporation should take over sufficient assets of the Rhode Island corporation to pay for the common stock of the new company, and that the balance of said assets, $1,218,131.65—the surplus of the old Rhode Island corporation—should constitute the paid-in surplus capital of the new corporation at its organization. It was ascertained that $690,018.39 of this surplus was accumulated by the Rhode Island corporation prior to March 1, 1913. On the same day—May 25, 1917— the Rhode Island corporation distributed, "as a final distribution in liquidation" to its common stockholders, in exchange, share for share, of their common stock in the corporation, the said capital stock of the new Massachusetts corporation. The complainant trustee exchanged the two hundred and seventeen shares of the old corporation held by it as part of the residuary estate.

Three days later, May 28, 1917, the Massachusetts corporation voted to issue preferred capital stock to the amount of $750,000 under a contract of underwriting with bankers and to give subscription rights thereto to its common stockholders, in the proportion of three shares preferred for every four shares of common stock. The entire issue of preferred stock was sold and paid for in cash. The trustee did not subscribe.

The "plan of re-organization," so-called, was completed by the Massachusetts corporation declaring on June 29, 1917, and on August 24, 1917,—out of the surplus accumu-

lated by the Rhode Island corporation prior to March 1, 1913,—dividends of $50, $10 and $9 per share, payable respectively on June 30, September 1, and October 1, 1917. Letters were sent with the checks stating that each payment was in distribution of surplus earned prior to March 1, 1913, and that, in the opinion of counsel, the payment would be free from Federal income taxes. The complainant trustee received on account of these three payments, a total of $14,973.00, and it is regarding the distribution of this sum that the trustee now seeks instruction.

The question presented to the court is whether this fund of $14,973.00, representing dividends, should be paid by the trustee to the life tenant as income or added to the *corpus* of the trust estate for the benefit of the remainderman.

The fund in question represents extraordinary dividends. These dividends were 50%, 10% and 9%, payable respectively June 30, September 1, and October 1, 1917. For several years the old Rhode Island corporation paid regular quarterly dividends amounting to 13% annually. The letter of May 17, 1917, from the Rhode Island corporation to its stockholders, describing "the plan of re-organization stated that "the plan would make possible a distribution of a part of the company's surplus" and also that "the dividend charges on the new preferred stock will not imperil the continuance of regular quarterly dividends on the common stock." When the checks making the payments of $50, $10, and $9 per share were sent to the stockholders, a letter in each instance was enclosed stating that the paymen- was in distribution of surplus earned prior to March 1, 1913. It is conceded that these dividends were earned before March 1, 1913, that is, before the testator's death and the commencement of the trust.

If the testator in his will had expressed an intention relative to the disposition of extraordinary dividends such intention would govern. *R. I. Hospital Trust Co.* v. *Bradley*, 41 R. I. 174; *Bushee* v. *Freeborn*, 11 R. I. 149, 150. But the testator made no special provision for extraordinary dividends. He makes no specific mention of his stock in the

Hope Webbing Company and his intention cannot be gathered from the will.

The law is well settled that ordinary dividends, regardless of the source whence or the time when the fund was accumulated, go to the life tenant. Ordinary dividends are presumed to have been earned when declared. *Newport Trust Co.* v. *Van Rensselaer*, 32 R. I. 231; 7 R. C. L. 291; *Matter of Osborne*, 209 N. Y. 450, 476.

(2)    On what principle shall we determine whether the fund representing extraordinary dividends is income going to the life tenant or capital to be held for the benefit of the remaindermen?

A few courts have adopted what has been termed a "practical rule of convenience" and commonly known as the Massachusetts rule. The rule was first stated as follows: "A simple rule is to regard cash dividends, however large, as income and stock dividends, however made, as capital." *Minot* v. *Paine*, 99 Mass. 101, 108. When surplus is distributed in cash these courts say it is income regardless of the time when the surplus was accumulated and give the dividend to the life tenant. If the distribution is in the form of a stock dividend it is capital and belongs to the corpus of the trust. In other words, cash is income and stock is capital. "The simple question in every case is whether the distribution made by the corporation is of money to be spent as income or is of capital to be held as an investment in the corporation." *D'Ooge* v. *Leeds*, 176 Mass. 558. See *Gibbons* v. *Mahon*, 136 U. S. 549; *Richardson* v. *Richardson*, 75 Me. 570; *DeKoven* v. *Alsop*, 205 Ill. 309. These courts give extraordinary cash dividends to the life tenant regardless of whether the surplus from which the dividend came was accumulated before the death of the testator or during the life of the trust. In *Talbot* v. *Milliken*, 221 Mass. 367, a cash dividend of 50% was declared within, at least, one year after the creation of the trust, by a corporation with surplus assets, at the death of the testator, nearly equal to its capital stock, and the court held that the dividend was income and should go to the life tenant.

The question of disposition of an extraordinary cash dividend earned before the creation of the trust has never been considered by this court.

We cannot sanction a rule which depends entirely upon the action of a board of directors attending to their own business, in their own proper way, with no thought or care as to the rights of life tenants and remaindermen. If, from surplus accumulated before the death of the testator, the directors declared a cash dividend, by such a rule it goes to the life tenant as income although it was not earned by the trust fund. Had the directors instead of distributing cash used the money to purchase stock in their corporation, the stock dividend would go to the *corpus* and the trust fund would not be robbed for the benefit of the life tenant. If a stock dividend is declared from the surplus accumulated during the life of the trust the *corpus* is enriched at the expense of the life tenant. The great weight of authority is opposed to this rule.

In *Vinton's Appeal*, 99 Pa. St. 434, the court said: "The rule . . . is a very simple and convenient one and may relieve trustees and courts of much trouble but it is certainly not one that commends itself for its justice and equity. . . . To us it seems like a bungling rule of law that, at one time, would give what is indisputably income to the remainderman, and at another, what is as clearly capital to the life tenant."

Much of the confusion has arisen through the inability (by lack of evidence) or unwillingness of courts to apportion dividends when the surplus was earned partly before and partly after the creation of the trust. We know of no reason why a court should refuse to effectuate the intention of the testator and do justice between the parties by apportioning an extraordinary dividend, and many courts whose opinions are highly respected do not hesitate to apportion dividends earned partly before and partly after the creation of the trust.

In *Earp's Appeal*, 28 Pa. 368 (a leading case which has been consistently followed by the Pennsylvania Court) stock

dividends having been declared based upon surplus accumulated partly before and partly after the death of the testator were equitably apportioned between the life tenant and the remainderman.   See also *In Re Smith's Estate infra; Matter of Osborne*, 209 N. Y. 450; *Van Doren* v. *Olden*, 19 N. J. Eq. 176; *Thomas* v. *Gregg*, 78 Md. 545, 28 Atl. 565.

A sensible and equitable rule for disposing of extraordinary dividends was enunciated in *In Re Smith's Estate*, 140 Pa. St. 344, 352:   "But it is well settled in this state, when the stock of a corporation is by the will of a decedent given in trust, the income thereof for the use of a beneficiary for life, with a remainder over, the surplus profits, which have accumulated in the lifetime of a testator but which are not divided until after his death, belong to the *corpus* of his estate; whilst the dividends of earnings made after his death are income, and are payable to the life tenant, no matter whether the dividend be in cash, script or stock."   This rule, known as the Pennsylvania rule, is some times called the American rule.

*In Re Smith's Estate, supra*, a corporation with large assets accumulated before the death of the testator increased its capital stock, permitting the stockholders, in proportion to their holdings, to subscribe for the stock at par.   The stockholders, including the trustees, subscribed and paid cash for the stock.   Immediately thereafter the corporation declared a cash dividend on its whole stock equal to the amount received by the sale of the new stock.   It was held that the new stock and the cash dividend were capital and not income.

Judge Bartlett, in *Matter of Harteau*, 204 N. Y. 292, 299, used the following language:   "The question whether the surplus dividend is to be deemed capital or income depends upon the time of the acquisition of the surplus which was divided."   *Matter of Harteau, supra*, is cited with approval in *Matter of Osborne, supra*.   The latter case reviews the New York decisions and uses the following language, at page 477:   "Notwithstanding the difficulty in many cases of apportioning dividends, it is wiser and better to leave an

apportionment to courts of equity, in preference to adhering to a rule that depends more upon its simplicity and convenience of enforcement than upon justice and right. The distinction between ordinary and extraordinary dividends is necessary to make a workable rule and at the same time preserve the integrity of the trust fund. The integrity of the trust fund and rights of the life beneficiary under the trust should each be considered, determined and preserved by a court of equity. As far as the courts in this state have made statements  to the contrary, it has been in opinions where such statements have been unnecessary to the determination of the case then under consideration, and such statements are disapproved. It should be held: 1. Ordinary dividends, regardless of the time when the surplus out of which they are payable was accumulated, should be paid to the life beneficiary of the trust. 2. Extraordinary dividends, payable from the accumulated earnings of the company, whether payable in cash or stock, belong to the life beneficiary, unless they entrench in whole or in part upon the capital of the trust fund as received from the testator or maker of the trust or invested in the stock, in which case such extraordinary dividends should be returned to the trust fund or apportioned between the trust fund and the life beneficiary in such a way as to preserve the integrity of the trust fund."

Cases involving the disposition of large extraordinary cash dividends are not numerous. Corporations are probably more given to issuing stock dividends against accumulated surplus than distributing the surplus in cash but, as we have shown above, the same rule should apply whether the dividend be in stock or cash. In this case there is no necessity for apportionment. The whole of the dividend came from surplus accumulated before the death of the testator. The fund in question was not earned by the trust capital. It was earned long before the creation of the trust. The surplus, from which the fund was derived, gave an additional value to the trust capital and the dividends, although at that time undistributed, were practically a part of the trust capital when the trust came into being. "If the trustees in

order to change the investment, had at the testator's decease sold the shares, they would have received their value as affected by the surplus then undivided, and the amount received would in that case, have been the principal upon which the life tenant would be entitled to receive income. Upon what principal of justice, then, should the act of the corporation, over which the parties had no control be allowed to affect their rights, by taking from the remaindermen that which clearly belongs to them, and handing it over bodily to the life tenant?" *In Re Smith's Estate*, 140 Pa. St. at page 356.

Let us view the case from another angle. Although the first letter to the stockholders described a plan for "re-organization of the capitalization of your Corporation" the later correspondence spoke of "liquidation," "dissolution" and "winding up." We think the facts show a re-organization rather than a dissolution. But, if the dividends are to be considered dividends of capital assets in liquidation, the fund belongs to the *corpus* of the estate. Authorities agree that capital assets in liquidation are capital and not income. See *R. I. Hospital Trust Co.* v. *Bradbury, supra; Brownell* v. *Anthony*, 189 Mass. 442; *Curtis* v. *Osborn*, 79 Conn. 555.

Although the dividends were in form cash dividends, the practical effect of the transaction was an issue of a stock dividend. It is probable that neither the old nor the new corporation had sufficient cash available to pay the dividends which amounted to 69% of the capitalization. Before the dividends were declared the new corporation issued preferred stock at par to the amount of $750,000. The preferred stock was first offered to the old stockholders. The amount received from the sale of preferred stock was a little larger than the fund distributed in extraordinary dividends. Not only do the letters from the Rhode Island corporation to its stockholders indicate an intention to pay the dividends in question from the proceeds of the sale of the preferred stock but the records of the Massachusetts corporation clearly show that the dividends were paid from such pro-

(4) ceeds. It is apparent that a stock dividend was declared against surplus assets and that, instead of distributing the stock among the stockholders, the corporation sold the stock and distributed the greater portion of the cash received from the sale of the stock. The stockholders, instead of receiving a preferred stock dividend, received, in lieu thereof, cash from the proceeds of the sale of a preferred stock issued against surplus. As we have already indicated the decision should be the same whether the dividends be considered stock dividends or cash dividends but the authorities are almost unanimous in holding that an extraordinary stock dividend declared against surplus accumulated before the creation of a trust goes to the *corpus* of the trust. *Parker* v. *Mason*, 8 R. I. 427; *Brown* v. *Larned*, 14 R. I. 371; *Greene* v. *Smith* 17 R. I. 28; 7 R. C. L. 291; see cases cited in foot note of *Green* v. *Bissell*, 118 A. S. R. 167 and 168; *Talbot* v. *Milliken*, 221 Mass. 367; *Matter of Osborne, supra; In Re Smith's Estate, supra; Van Doren* v. *Olden, supra; DeKoven* v. *Alsop, supra; Bryan* v. *Aiken* (Del.), 86 Atl. 674.

Would the situation of all the parties including the corporation be materially different if the corporation had actually issued and distributed a preferred stock dividend and the trustees had sold their allotment of preferred stock? As we have shown above the preferred stock thus issued would be capital and belong to the trust fund. After the trustees sold their preferred stock would any one say that the proceeds were income which must be given to the life tenants?

By holding that the dividends are capital and not income, the trust fund is preserved. The assets which went into the trust fund remain as the testator knew those assets at his decease. To decide otherwise would enrich the life tenant at the expense of the trust fund. The surplus, which increased the value of the stock in the trust fund, would be taken away from the trust and the trust left with a stock not only shorn of its surplus but burdened by a preferred stock. The cash received from a sale of stock having a preference

over the common stock is no more income on the common stock than borrowed money secured by a mortgage on a farm is income and profit from the farm.

Our decision is that the fund in question belongs to the *corpus* of the trust estate and not to the life tenants, and the complainant is advised accordingly.

On July 7, 1919, at ten o'clock A. M. the parties may present a decree in accordance with this opinion.

*Tillinghast & Collins,* for complainant. *Harold B. Tanner,* of counsel.

*Benjamin F. Lindemuth,* for respondents.

*Elisha C. Mowry, Guardian ad litem, pro se ipso.*