Bill for construction of will and instructions to trustee. Eugene Du Pont died January 28, 1902, leaving two sons and three daughters. By his will he divided two-thirds of his residuary estate into five equal parts, one of which he gave absolutely to one son, another of which he gave absolutely to another son, and the other three-fifths he gave to trustees, in trust to hold and allot one of said fifths to each of his three daughters. The one-fifth thus allotted to each daughter was to be held by the trustees upon trust to collect and receive the income from the real estate "and the interest and income from the personal property," and after deducting expenses of administering the trust estate to "pay the said net income thereof to my said three daughters, respectively, for and during their respective lives" with remainders over.
The three daughters are living, two of them being married and having issue and the other never having been married.
At the time of his death Mr. Du Pont owned 4,000 shares, being one-fifth of the whole capital stock of E. I. Du Pont de Nemours 
Company, a corporation of Delaware, organized in 1899. This stock was appraised, as appears by the appraisement filed in the office of the register of wills as worth $1,400,000.
In 1902 a proposal was made by T. Colemen Du Pont. Pierre S. Du Pont and Alfred I. Du Pont to purchase all the property of the 1899 corporation for $12,000,000, the appraised value thereof, payable in purchase-money notes of a new corporation to be organized. Such new corporation, called E. I. Du Pont de Nemours Company, was formed in 1902 under the laws of Delaware with an authorized capital stock of $20,000,000. The new corporation made the purchase upon the terms offered. Before the sale to it was made, however, the 4,000 shares of stock held by the executor in the selling corporation were revalued at $2,400,000. The sale was made by the old corporation to the new for $12,000,000 in purchase-money notes of the new corporation and $12,000,000 par value of its common capital stock. The executors as holders of 4,000 shares in the old corporation (one-fifth of its total) received therefor one-fifth of the purchase-money notes and in addition 6,000 shares of stock in the new 1902 Delaware corporation.
The executors passed their first and final account on March 31, 1903, and valued the 6,000 shares then held by them at nothing.
On the same day they transferred to themselves as trustees for the three daughters three-fifths of two-thirds of the purchase-money notes received by them and three-fifths of two-thirds of the 6;000, or 2,400, shares of the common stock of the 1902 Delaware corporation. As trustees, they took over the 2,400 shares from themselves as executors at the valuation of nothing. These shares were thus taken over along with other securities by permission of the Court of Chancery. The trustees then carried the shares in their accounts, 800 shares being allotted to each of the three trusts for the three daughters respectively.
On May 19, 1903, a New Jersey corporation was organized known as E. I. Du Pont de Nemours Powder Company. The Delaware company of 1902 sold all of its property, including stock in about-35 other companies, to the New Jersey corporation of 1903 for $30,200,000 of the preferred and common stock of that company.
In 1912 the E. I. Du Pont de Nemours Company (Delaware 1902) was decreed by the United States federal court to be dissolved. At the time of dissolution the trustees still held the 2,400 shares of its stock in trust for Mr. Du Pont's three daughters and had purchased with trust funds 273 additional shares, making the total held in the trust at the time of said dissolution 2,673 shares. Under the terms of the decree of dissolution there was paid to the trustees on account of the 2,673 shares in the Delaware (1902) dissolving company, in addition to other securities not involved in this suit the following:
 3,855 shares of the common stock of E. I. Du Pont de Nemours Powder Company (New Jersey 1903).
 855 plus, shares of common stock of Hercules Powder Company.
Of these shares, 2400/2673 were received on account of the 2,400 shares of the Delaware (1902) company acquired by the trustees in the manner above set out.
In addition to said 3,855 shares of the New Jersey company of 1903, the trustees acquired 15 other shares of that company which *Page 151 
came to them through the ownership of 12 shares of stock of Delaware Securities Company acquired by them from Eugene Du Pont's estate. These 12 shares of Delaware Securities Company were appraised by the executor as worth nothing. The Delaware Securities Company was dissolved and the trustees received in lieu of the 12 shares held by them the 15 shares of common stock of the New Jersey (1903) corporation just referred to. In the year 1910 the trustees acquired by purchase 3 additional shares of the New Jersey company (1903). The total shares of common stock acquired by the trustees as aforesaid amounted to 3,873. The following tables show by way of recapitulation and in condensed form the source of these shares:
Dates When Shares of E. I. Du Pont de Cost to
Acquired. Nemours Co. (1902) Estate.
_____, 1902 2,400 appraised at $ 0.00
Nov. 1, 1906 24 at $100 2,400.00
Dec. 6, 1907 36 at 100 3,600.00
June 18, 1908 147 at 100 14,700.00
Sept. 16, 1910 63 at 200 12,600.00
Oct. 15, 1910 3 at 200 600.00
 ______ ____________
 2,673 $33,900.00
 ______ ____________
Dec. 4, 1912 Above 2,673 shares of E. I.
(dissolution) Du Pont de Nemours Co.
 (1902) surrendered for:
 1,065 shares of E. I. Du Pont
 de Nemours Powder Co.
 Preferred stock
 3,855 shares of E. I. Du Pont
 de Nemours Powder Co.
 Common stock (1903)
 (also Hercules and Atlas se-
 curities)
Dates When Shares of E. I. Du Pont de Cost to
Acquired. Nemours Powder Co. (1903) Estate.
Dec. 4, 1912 Above 3,855 and other securi- $33,900.00
Mar. 31, 1903 15 ties appraised at 0.00
Apr. 9, 1906 3 55.32
 ______ ____________
 3,873 $33,955.32
 ______ ____________

At a meeting of the board of directors of the Du Pont Company (New Jersey 1903) held on August 19, 1915, "a plan for the financial reorganization of the company" was approved and recommended to the stockholders. The salient features of the plan were: (1) The incorporation of a new company to be known as E. I. Du Pont de Nemours Company under the laws of Delaware with an authorized capital of $240,000,000 divided into $150,000,000 par value non-voting debenture stock, $10,000,000 par value voting debenture stock, and $80,000,000 par value common stock; (2) the new Delaware corporation to purchase all the assets, property, contracts and good will of the New Jersey (1903) corporation for the sum of $120,000,000 payable as follows: $1,484,100 in cash, $58,854,200 par value in common stock and $59,661,700 par value in debenture stock of the Delaware corporation; (3) "the New Jersey corporation to declare a dividend of 200 per cent. to the common stockholders, payable in Delaware corporation common stock."
The stockholders duly approved of this plan and the agreement of sale was entered into between the two corporations on September 16, 1915, after appropriate resolutions were adopted authorizing it. The sale was consummated as agreed. The officers and directors of the purchasing company were the same individuals who had been and still continued to be officers and directors of the selling company. On September 18 the treasurer of the Du Pont Company (New Jersey 1903) notified its stockholders that "a dividend of 200 per cent. on our common stock has been declared payable in common stock of the E. I. Du Pont de Nemours Company (Delaware 1915) to our common stockholders of record September 30, 1915," etc.
As a result of this action the 3,873 shares of stock (New Jersey 1903) held by the trustees as aforesaid, entitled them to receive 7,746 shares of the common stock of the new Delaware company of 1915. They also continued to hold the 3,873 shares of common stock in the New Jersey (1903) corporation, which continued its corporate existence until 1926, when it was dissolved. Its corporate existence until that date, however, appears to have been continued, not because of any desire on its part to continue in the same sort of business it had theretofore conducted and sold in 1915, but solely in order to facilitate the convenient process of dissolution. After the sale to the Delaware company of 1915 and the declaration of the 200 per cent. dividend payable in Delaware company stock, the New Jersey company of 1903 had left in its treasury enough cash to redeem its 5 per cent. bonds (outstanding $1,230,000) and enough debenture stock of the Delaware company (1915) to pay off its 41/2 per cent. bonds (outstanding $14,160,000), and its preferred stock (outstanding $16,068,600) and leave one share of the Delaware company's debenture stock for each share of the New Jersey company's common stock (a total for this purpose of $29,427,100 in par value). It is not material in this cause to explain the manner in which the New Jersey company (1903) liquidated its preferred stock and bond obligations. Referring to the common stock, of which 3,873 shares were, as stated, held by the trustees, its holders received in September, 1918, "a liquidating dividend" amounting to $90 a share payable in the debenture stock of the Delaware company, which liquidating dividend was consequent upon the reduction of the par value of the New Jersey company's (1903) stock from $100 per share to $10. In June, 1926, the liquidation of the New Jersey (1903) company was completed and on final distribution its common stockholders received a dividend of one-eleventh of a share of the *Page 152 
Delaware company's (1915) debenture stock and $1 in cash for each share of common held by them.
The fair market value of the New Jersey (1903) company's stock on September 30, 1915, immediately preceding distribution of the 200 per cent. dividend payable in the Delaware company's (1915) stock, was $795 per share, and immediately after the distribution on October 1, 1915, it was $100 per share. The fair market value of the Delaware company's (1915) stock distributed in payment of the 200 per cent. dividend was on October 1, 1915, $347.50 per share.
On September 30, 1915, the statement of assets and liabilities of the New Jersey (1903) company showed a surplus of profit and loss of $29,955,799.36.
On the next day, October 1, 1915, the sale to the Delaware company was effectuated by delivery of deeds and bills of sale. The purchasing company then made up a statement of assets and liabilities. Of course these were the same assets and liabilities which had been taken over from the New Jersey corporation. But instead of a surplus of $29,955,799.36 as shown by the New Jersey corporation on the day before, a surplus of the same assets over liabilities is shown by the statement of the Delaware corporation (October 1, 1915) of only $347,750. What had been done by the Delaware corporation in making up its statement was, as against a common stock liability of the New Jersey company, to increase its own common stock liability to twice as much, or $58,854,200. By transferring from the surplus account of the old New Jersey company's statement practically all the funds in that account, there would have been ample to cover the additional common stock which was thus issued, and would have permitted the issuance to the New Jersey company of the Delaware company's common stock in an amount equal to 200 per cent. of the New Jersey company's outstanding common and thus have put the matter in a position to declare a 200 per cent. dividend to its common stockholders payable in Delaware company's common stock, provided that was all that the New Jersey company was to receive on account of its common stock. But inasmuch as the New Jersey company's common stock was to receive in addition a share of the Delaware company's debenture stock for each share outstanding, it was necessary for the Delaware company to find among the assets of the New Jersey company acquired by it a value larger than that which the New Jersey company had theretofore given to them — larger by the amount of the par value of its outstanding common stock. This additional value was thought to be found in a theretofore unlisted asset, namely, unfulfilled contracts that had been entered into by the New Jersey company for the making of military explosives for use of the great powers engaged in the war with Germany and her allies. Accordingly an asset item called "contracts" was listed in the Delaware company's statement of October 1, 1915, and valued at $29,152,116.75. This new item of assets supplied the sum necessary to support what additional capital stock was required to be issued to the New Jersey company in order for it to have left in its treasury enough stock of the Delaware company to match share for share its own common stock outstanding after the 200 per cent. dividend in the Delaware company's common had been paid. (The sum referred to as the value given to the item called "contracts," lacked $275,165.80 of meeting the par value of the New Jersey common stock outstanding, and so, to be exact to a nicety, it would be necessary to go into a detailed examination of the balance sheets to discover the source of an additional $275,165.80 in asset values or liability reductions. But this is not necessary.)
It, therefore, appears that after the sale was made and the reorganization of the business was complete, assets which in the hands of the New Jersey company (referring only to the common stock as that is all that the case is concerned with) had, by reason of a surplus, shown common stock asset' values which were in round numbers twice, or 200 per cent. of, the par value of its common stock, when found in the hands of the Delaware company are, by reason of a newly added asset, made to support a value of 300 per cent. of the New Jersey company's common stock. Stock of the Delaware company, debenture and common, was issued to the New Jersey company against the revalued assets on the basis of their new valuation.
After such issuance of stock all that the New Jersey company had by way of assets was the proceeds of the sale. These assets as valued by the New Jersey company were as follows:
Cash $ 1,484,100 00 Debenture stock (Delaware company) 59,661,700 00 Common stock (Delaware company) 58,854,200 00 ________________ Total $120,000,000 00
On the liability side of the statement the following shows its situation:
5 per cent. bonds $ 1,230,000 00 4½ per cent. bonds 14,166,000 00 Capital stock: Preferred $16,068,801 34 Common 29,427,282 55 ________________ 45,496,083 89 Profit and loss 59,107,916 11 ________________ $120,000,000 00
It will be seen, from the face of this statement, that the New Jersey corporation had a sufficient profit and loss surplus to warrant a 200 per cent. dividend to its common stockholders and leave its capital unimpaired. The corporation declared and paid *Page 153 
such dividend in the common stock of the Delaware company, retaining sufficient cash and debenture stock to cover its funded debt and preferred stock obligations and then leave enough of assets to pay its common stock in full at least at par. The sequel proved that the common stock was paid off at a little better than par.
This 200 per cent. dividend paid in common stock of the Delaware company is one of the dividends with which the present bill is concerned. The question with respect to it is whether it is income and as such belongs to the life beneficiaries, or whether it is to be held by the trustees as a part of the corpus of the trust for ultimate disposition in remainder.
There are two other Du Pont Company dividends concerning which the same question arises. These were both declared by the Delaware (1915) Du Pont Company.
One of them was declared December 5, 1922. It was a dividend of 50 per cent. payable in its own common stock. The trustees as holders of 7,746 shares of the common stock received 3,873 shares of common stock in payment of this 50 per cent. dividend. The resolution authorizing this dividend was as follows:
"Resolved that a dividend of 50 per cent. (50%), payable in common stock of the company at par, be paid on the outstanding common stock of this company on the 29th day of December, 1922, to stockholders of record at the close of business on the 16th day of December, 1922."
The resolution did not recite the source from which this dividend was derived. The admitted facts are, however, that at the time the dividend was declared the company had more than enough of accumulated earnings to cover the dividend. The following letter from the treasurer of the company In explanation of the 50 per cent. stock dividend is admitted by all the parties to the cause:
"E. I. Du Pont de Nemours Company, Incorporated,
"Wilmington, Delaware.
"Executive Offices:
"Equitable Trust Company,
"Ninth and Market Streets,
"Wilmington, Delaware.
"January 26, 1923.
"Gentlemen: In response to your inquiry in that regard you are advised that the 50% dividend payable December 29, 1922, to outstanding common stockholders of E. I. Du Pont de Nemours Company on December 16, 1922, was declared by the board of directors of said company, duly assembled on the 5th day of December, 1922. This stock dividend so paid on the 29th of December, represents a capitalization of accumulated earnings of the company of previous years. "Yours very truly, "W. S. Carpenter, Jr., Treasurer."
For ten days prior to the payment of this dividend the value of common stock as reflected by sales on the New York Stock Exchange ranged from $153 to $162% per share, and for ten days following said payment it ranged from $105 to $116 a share. Prior to the dividend payment, the rate of regular dividends was 8 per cent. and thereafter continued for some time at the rate of 6 per cent.
The next and final stock dividend declared by the Delaware (1915) Du Pont Company was so declared on June 22, 1925, and was for 40 per cent. payable to its common stockholders. The trustees, who then had 7,746 plus 3,873, or 11,619 shares of the common stock, received as their part of the 40 per cent. dividend so declared, 4,647.6 shares, making the total Du Pont common stock now in the trust 16,266.6 shares. The facts connected with the 40 per cent. stock dividend are admitted to be as shown in the company's letter to its stockholders which is in its material parts, as follows:
"The value of your company's 70% interest in 1,875,000 shares of General Motors Corporation common stock was adjusted on the books of the company in June of this year from its cost of $42.35 per share or a total of $55,589,107 to a new figure of $70 per share or a total of $91,875,000 which closely corresponded to its net asset value on the books of the General Motors Corporation at June 30, 1925.
"This adjustment resulted in an increase in surplus of $36.285,893, making a total surplus as of June 30th of $96.334,138. To capitalize a portion of this surplus your board of directors on June 22d declared a special dividend of 40% on the common stock, payable August 10th in common stock of the company, thereby increasing the outstanding common stock by $38,019,360 to a new total of $133,080,300 par value."
For ten days prior to the payment of this dividend the value of the common stock as reflected by sales on the New York Stock Exchange ranged from $187 to $201.50 per share, and for ten days following said payment it ranged from $139 to $165 per share. The regular dividend rate was continued after the payment of the stock dividend at the same rate as had been paid prior thereto.
As a result of the dissolution of the Du Pont Company (Delaware 1902) the trustees, it will be remembered, received on account of the trust estate 855 plus shares of the common stock of the Hercules Powder Company. In addition they bought 84 additional shares at a cost of $110 per share. Their holdings in that stock were then 939 shares.
On October 26, 1922, the Hercules Powder Company declared, "out of the surplus earnings, a stock dividend of 100 per cent., * * * such dividends to be in common stock of the company at par." It is admitted that the surplus earnings of the company amply covered this dividend, such surplus being $14,750,896.34 and the dividend being for only $7,150,000 in stock at par. For ten days prior to the payment of the dividend the value of the common *Page 154 
stock as reflected by the bid and asked quotations ranged from $195 to $205 per share and actual sales were made at $200 per share, and for ten days following said payment the range of bid and asked prices was from $97 to $102 per share and actual sales were made at from $99 to $102 per share. The present fair market value per share is from $104 to $108. Before the stock dividend the regular annual rate of dividend on the common stock was $10 per share; after the stock dividend, the regular annual rate was and now is 5 per cent.
The bill presents the question, similar to that arising in connection with the Du Pont stock dividends, whether the Hercules stock dividend is income belonging to the life beneficiaries under the trust, or must be held by the trustees as a part of the corpus for ultimate disposition in remainder.
There are four dividends with which we are concerned in this case. They are:
(1) The 200 per cent. dividend paid on October 1, 1915, in common stock of the Du Pont Company (1915) of Delaware to the common stockholders of the Du Pont Company (1903) of New Jersey. This dividend amounts to 7,746 shares of the Delaware company.
(2) The 50 per cent. dividend of 3,873 shares of its own common stock paid to the Delaware Du Pont Company's common stockholders on December 29, 1922.
(3) The 40 per cent. dividend of 4,647.6 shares of its own common stock paid to the Delaware Du Pont Company's common stockholders. And
(4) The 100 per cent. dividend of 939 shares of its own common stock paid by the Hercules Powder Company to its common stockholders on November 15, 1922.
Do the dividends become a part of the corpus of the trust, or do they constitute income which goes to the life beneficiaries? This is the question which the bill presents.
Courts both in England and America have been called upon in a great many cases to consider the correct principle to apply in controversies between life tenants and remaindermen over what constitutes income and what does not. It is impossible to reconcile the various rules laid down in various jurisdictions. They appear to be in hopeless conflict in certain very material respects. There is no occasion for me to review and discuss the numerous cases that may be found in the books with the view of deciding what should be the general determining principles for guidance in this state. Our Supreme Court in the case of Bryan et al. v. Aikin et al., 10 Del. Ch. 446, 86 A. 674, 46 L.R.A. (N.S.) 477, has done this in a learned and discriminating opinion written by the present Chief Justice. The general principles which underlie consideration of such questions as the pending bill presents are to be found in that opinion. Before addressing myself to an examination of the question which the particular facts of the instant case present, it is appropriate to notice the language used in Bryan et al. v. Aikin et al., as expressive of the general principles which must be regarded in answering the sort of question we are here concerned with. While some of the language thus employed might be said not to have been necessary for a decision of the particular case which was before the court, yet it is not to be dismissed as obiter for two reasons. The first reason is that in so far as it discloses the logic which induced the court to lay down the rule for this jurisdiction which it did, such language is entitled to acceptance as controlling in later cases where the deciding tribunal is seeking the correct ratio decidendi for its own conclusions. And in the second place, the court in the case of Bryan et al. v. Aikin et al., seems to have designedly intended to lay down general principles which hereafter are to be regarded as settled in Delaware, regardless of whether the facts of the particular case then before it required either an acceptance or rejection of those principles; for the court said that, if possible, the rule adopted by it should be such as not only to govern the case before it, but should be such as would "also furnish a guide for trustees in the execution of other trusts of like character."
I feel bound, therefore, to accept as final not only the rule which the precise facts of Bryan v. Aikin necessitated, but also the rule in its broad scope which that case announced as well as the fundamental principles of reason which underlay the court's general conclusions.
There were two propositions which the court referred to in Bryan v. Aikin as not likely to be disputed. These were:
"(1) That the intention of the testator must be carried out so far as can be under the law. (2) That it was the intention of. the testator in the present case that the capital or principal of the property left in trust should be kept .unimpaired for the remaindermen, and that all dividends declared thereon out of the profits or net earnings should go to the life tenant."
These primary propositions are applicable to the instant case. While the will of Eugene Du Pont did not in terms give dividends to the life tenants, yet it did give net income to them. And there can be no doubt, as indeed none has been suggested, that the word "income" embraces dividends when applied to *Page 155 
corporate stocks. The will therefore must be regarded as giving dividends to the life tenants.
But these dividends, before it is certain that they are the property of the life tenants, must, as indicated in the second general proposition above quoted, be out of the profits or net earnings of the corporation.
Whether in a given case a specified dividend is attributable to profits or net earnings as its source is oftentimes a perplexing question. The various rules adopted by the courts in answering this question seem not to conflict with each other upon the proposition that the dividend must come out of profits or net earnings. Their conflict, and it is pronounced, arises rather out of the question of what weight the law will allow to given facts as decisive of the question whether the dividend is to be attributed to capital or to earnings. The Chief Justice in his review of the authorities in Bryan v. Aikin clearly shows such to be the case.
The result in Delaware, since Bryan v. Aikin, is that the so-called "American rule" is accepted as the law here without the apportionment feature based on the date of the inception of the life estate which prevails in those states where the so-called Pennsylvania rule has been followed. The "American rule" is the rule in Delaware and, quoting from Bryan v. Aikin, is as follows:
"All net earnings, howsoever they may have been treated or used by the corporation during their accumulation, and regardless of the period during which they have accumulated, if declared as dividends out of net profits during the life tenancy, are given to the life tenant, whether such dividends are made in cash or capital, provided that the principal of the trust is not diminished thereby."
Seeking as it does to arrive at an adjustment of the respective rights of life tenants and remaindermen in accordance with equitable principles, the rule ought in many cases at least to contain the apportionment feature of the Pennsylvania decisions which hold that an allotment should be made to the corpus of that portion of the dividend, whether in cash or capital stock, which represents earnings accumulated before the inception of the life estate, and to income that portion of the dividend which represents earnings since the inception of the life estate. The only reason why the Pennsylvania apportionment feature has not been accepted generally is because of practical difficulties in its application. These difficulties are so insuperable that some courts, including our own Supreme Court, have deemed it best to reject the Pennsylvania rule.
But it is to be observed that those courts which have rejected the Pennsylvania rule that apportions earnings with respect to the inception of the life estate because of its practical difficulties, have in no wise receded from the principle that dividends to which the life tenant is entitled must in fact have their source in earnings.
The view that the life tenants' rights to dividends must depend on the nature of their source, that is upon their origin in earnings, is emphasized throughout the opinion in Bryan v. Aikin. I think it well to quote expressions from that opinion in support of the statement just made, because, as I view the instant case, the disposition of the 200 per cent. stock dividend turns very largely upon the force of this view. The following excerpts from the opinion referred to bear on this aspect of the matter.
"Was the 'stock dividend' declared out of the net earnings? Were there, at the time the dividend was declared, net earnings that could be distributed?" (That was the question to which the court addressed its attention.) * * *
"The judicial purpose now is to ascertain the character of the transaction which formed the basis of the dividend declared. Indeed, it may be said that in all states where the question has arisen, the question, whether a dividend, in stock or in cash, shall go to the life tenant or remainderman, depends very much upon the real purpose and character of the corporate act. For example, while it is true that in almost every case a cash dividend, whether usual or extraordinary, belongs to the life tenant, yet if it appears that the cash so distributed was derived from a sale of a portion of the real estate of the corporation as it existed prior to the trust, it will go to the remainderman, because it was not paid out of profits, but out of the corpus of the property. * * *
"When the necessity for the reservation [of earnings for corporate purposes] ceases, and the reserve fund is divided among the shareholders, the question whether it was income or capital depends upon its origin, for their source is not changed by the delay in distribution. If it was originally taken from the net earnings it belongs to the tenant for life if distributed in his lifetime. In such case the accumulated income, as well as the securities and real estate purchased, are all assets of the corporation, but the earnings are not regarded as capital although they may have been treated by the corporation as such prior to the distribution. * * *
"In both Massachusetts and Pennsylvania, indeed, under all the modern decisions, the court may and should examine the nature of the corporate transaction, as well as the character of the dividend declared in order to determine whether the dividend is in fact a distribution of net earnings or an apportionment of new capital. * * *
"It is much more reasonable to suppose that he [testator] contemplated that all dividends, no matter what they are called, which represented the capital of the corporation would go to the remainderman, and all dividends, by whatever name, which represented net earnings, would go to the beneficiary for life. We believe this to be the law' in this country according to the great preponderance of authority."
Before, therefore, the allotment of the dividend to either the life tenant or to the remainderman can be determined upon, the origin of the fund from which it is drawn must *Page 156 
first be ascertained, that is to say, whether it finds its source in earnings or in capital. In the process of locating the source, no conclusive significance is allowed in this state as there is in Massachusetts and the few states that follow the rule of that jurisdiction, to the fact that the dividend is in stock or in cash. The question with which the courts of this state are concerned disregards the form of the dividend and looks only to its real nature and character as the same is indicated by the dividend's derivation from earnings on the one hand or from capital on the other.
The general principle which thus makes the character of the distribution turn upon the nature of its source is applied not only in cases involving typical stock dividends, which was the case of Bryan v. Aikin, but as well in cases involving other forms of distribution. In Matter of Rogers, 22 App. Div. 428, 48 N. Y. S. 175, it was held that when a corporation is liquidated, its assets sold and the proceeds distributed among its stockholders, an apportionment must be made between the capital of the trust fund and the income, and so much of the sum received by the trustees as represents profits accumulated since the creation of the trust must be attributed to income and paid to the life tenant. (Of course under the rule of Bryan v. Aikin, the amount of income payable to the life tenant would not in this state be dependent upon the time of creation of the life estate, for all income whenever accumulated is regarded when distributed as belonging to the life tenant.) In Matter of U. S. Trust Co., 190 App. Div. 494,180 N. Y. S. 12, affirmed in 229 N. Y. 598, 129 N. E. 923, the sum received by trustees for shares of stock in the Lake Shore Michigan Southern Railway Company which was consolidated with another corporation, the trustees instead of taking stock in the consolidated company receiving the cash value of the shares as found in statutory condemnation proceedings, was apportioned between the life tenants and remaindermen according as the accumulated earnings of the Lake Shore Company were represented in the sum received. The case was held to be analogous to the distribution of assets of a corporation upon dissolution where the rule applies of alloting to income its proper share of accumulated earnings and what remains to principal. In the earlier case of In re Schaefer, 178 App. Div. 117, 165 N. Y. S. 19, affirmed in 222 N. Y. 533,118 N. E. 1076, the facts were said to have been in substance a liquidation to the extent of one-half of the corporate assets and a like apportionment between principal and income was decreed. In that case the holders of one-half of the corporation's stock sold their shares to owners of the other half who thereafter continued in control of the corporation as an active concern. The price received by the trustees for the stock sold by them was treated as though it had been paid in liquidation of one-half of the corporate assets and divided accordingly. The rule of the case of In re Schaefer was re-announced with approval in the later New York case of U. S. Trust Co. v. Heye, 224 N. Y. 242,120 N. E. 645. That rule was repeated as follows:
"Where the trust fund consists of corporate stock the life tenant will ordinarily be limited to receiving only so much of the profits as the corporation sees fit to distribute in dividends, but when the accumulated profits come into the hands of the trustees in any form ormanner, the life tenant is entitled to receive them."
In applying the New York rule the Court of Appeals in the last cited case allotted a portion of the dividends to corpus and a portion to income in accordance with what it conceived the evidence to show as to the nature and character of their source.
The case of In re McKeown's Estate, 263 Pa. 78, 106 A. 189, illustrates, as do the New York cases just referred to, how courts which reject the rigidity of the Massachusetts rule, and seek to arrive at what they regard as the equitable adjustment of the relative rights of life tenants and remaindermen, will disregard the form of the transaction in order to allow to income the enjoyment of earnings and at the same time preserve to the principal all of its values. In that case a trustee held shares of stock of the Pure Oil Company. All the stockholders of that company sold their stock for cash to the Ohio Cities Gas Company which acquired the entire assets of the Pure Oil Company. It was held that so much of the proceeds as represented the actual earnings of the Pure Oil Company went to the life tenants and all the rest, including profit on the sale. belonged to principal. The court said that it was true that a stockholder gets nothing from the corporation until a dividend is declared, but, observed the court, that is a matter between the corporation and the stockholders and does not necessarily determine the rights of a life tenant and remaindermen in an estate owning such stock. The opinion proceeds:
"If the company declares a dividend, whether of stock or cash, partially out of earnings and partially out of principal, a court of equity, made, cognizant of the fact, will apportion the dividend between the life tenant and remainderman, in such a way as to maintain intact the principal of the estate, only giving the balance to the life tenant. So also, if a corporation sells its capital and accumulated income for a gross sum, a court of equity should distribute that sum according to like equitable principles."
In the Estate of Gerlach, 177 Wis. 251, 188 N. W. 94, the court quoted with approval the following from a note in 12 L.R.A. (N.S.) 805:
"Logically, it would seem that the respective rights of life tenant and remainderman in extraordinary distributions should be governed by the same principles, whether the distribution *Page 157 
is made by a corporation which contemplates a continuance of its corporate existence and business, or is made in process of liquidation, or in contemplation of consolidation or merger with another corporation."
In applying this rule, the Supreme Court of Wisconsin in the cited case held that:
 "Whatever moneys come into the hands of trustees as the proceeds of the liquidation of the brewing company, which can be said to represent profits of the business of the company earned during the term of the life tenant, shall be paid over by the trustees to the life tenant."
See also in line, as I conceive it, with the foregoing authorities, the per curiam opinion in Mercer et ux. v. Buchanan et al. (C.C.A.) 137 F. 1019, reversing (C. C.) 132 F. 501; Lord v. Brooks, 52 N. H. 72; and Rhode Island Hospital Trust Co. v. Peckham, 42 R. I. 365,107 A. 209.
It appears, therefore, that where the ratio decidendi of the cases bearing on the sort of question we are now considering rests on the principle that the destination of the distribution is determined by the nature of its source, the same result is reached regardless of the form in which the transaction is cast — whether it be in the form of a typical stock dividend as in Bryan v. Aikin, or in the form of a distribution in liquidation, or in some way analogous thereto. Those cases which may appear to hold otherwise will be found to have arisen in jurisdictions where the Massachusetts rule,-which is a rule of convenience and adheres to the form rather than to the substance of the transaction, is acccepted as the law. The jurisdiction of Delaware, however, is not among them.
In view of the foregoing, it is necessary, in order to determine whether the dividends here in controversy possess the character of either income belonging to the life tenants or of capital belonging to the corpus, to ascertain from the facts whether their source is shown to be in earnings or in capital. There are four such dividends. The first, or 200 per cent., dividend is the most important one, as well as the one that causes the most controversy.
I now turn to a consideration of the facts which relate to that dividend in order to discover its source or origin. These facts will not be recited herein. They appear with sufficient fullness in the statement preceding the opinion. I shall discuss only their significance. The dividend was made possible by a transaction which in point of form was one of a sale between the New Jersey company as vendor and the Delaware company as vendee. The New Jersey company exchanged all its assets of every nature subject to all its liabilities (except capital stock and funded liabilities) for debenture and common stock of the Delaware company. It sold its entire business as a going concern. Out of the consideration received therefor it declared a dividend of 200 per cent. payable not in cash but in specific assets, viz. shares of common stock of the vendee company, leaving in its treasury sufficient debenture stock of the vendee company to pay yet another 100 per cent, dividend on its common stock. The 200 per cent. dividend, though paid in common stock, was not a typical stock dividend, because the stock which was distributed was not the New Jersey company's own capital shares.
The form of the transaction, therefore, was one of a sale of all assets and a distribution by way of a dividend of a portion of the consideration received therefor.
But the form of the transaction was not in my judgment the true indication of its real nature. What took place was a reorganization, not of the New Jersey company's capital structure to be sure, but a financial reorganization of its business. Instead of amending its own charter to make possible, if it could under the New Jersey law do so, the plan of reorganization decided upon it was found, for reasons which appealed to the responsible officers and the stockholders as good reasons, to be more desirable to provide for a new and distinct corporation which would serve as the convenient instrument to advance the plan of reorganization which all desired. The plan of reorganization formulated by the treasurer of the New Jersey company, approved and recommended by the directors and authorized by the stockholders, together with the official explanation given contemporaneously with the events, and the circumstance that the entire personnel of officers, employees and stockholders was carried over bodily so.to speak to the new corporation — all show conclusively to my mind that there was in every essential matter of substance not a sale of the old business, but simply a reorganization of the same. This view, I am aware, does not appear to be in harmony with what was said in the majority opinion in U. S. v. Phellis, 257 U. S. 156, 42 S. Ct. 63, 66 L. Ed. 180. It is with diffidence that I venture to appear to be unwilling to accept without question any views not only of law but as well of fact which the Supreme Court of the United States seems to entertain. I venture to do so here, however, because it seems to me that views of fact rendered in a tax cause are not entitled to be persuasive when the rival equities of life tenants and remaindermen are involved in a controversy dealing with property rights.
And so I regard the so-called sale as nothing more than the form which was desired in order to effectuate the purpose of reorganizing the business which the corporation owned but which, equitably speaking, belonged to the stockholders. It was simply a plan whereby the old business should go forward into the future as in the past and all its old stockholders should continue to *Page 158 
go along with it with the same relative rights as they had theretofore respectively enjoyed.
This being so, the dividend of 200 per cent., though declared in stock of a new company, is to be tested for the nature of its origin just as though the new company had never been formed and the rearrangement of the New Jersey company's capital had been effectuated by way of amendment of its own charter increasing its authorized capital and the ensuing declaration of a 200 per cent. dividend payable in its own common stock. In other words, all that was done is to be regarded for the purposes of this case as having been done by the New Jersey company in dealing with its own assets and the existence of the new company and the formality of sale to it are to be disregarded.
Taking the view then that the ultimate destination of the 200 per cent. dividend paid in the Delaware company's stock should be governed by what would be the result had the New Jersey company so reorganized itself as to declare a like dividend of 200 per cent. payable in its own capital stock, it now becomes necessary to examine the evidence for the purpose of seeing what source such a dividend would have had to have been drawn from out of the New Jersey company's assets. Would it have come from surplus or from what is properly regarded as capital?
To answer this question we must refer to the financial statements of the company. In the ensuing discussion I shall assume, as did the parties at the argument, that whenever a surplus of profit and loss is mentioned in financial statements, the expression means accumulated earnings. On September 30 the statement of assets and liabilities showed a surplus called profit and loss in the statement of $29,955,799.36. On the same day the common capital stock account shows a liability of $29,427,282.55. There was then a sufficiency of surplus to warrant a declaration to the common stock of a 100 per cent. dividend payable therefrom in the company's common stock. If, therefore, a 200 per cent. stock dividend had been declared, practically one half thereof would have been an intrenchment upon capital. In that event one half of the dividend would belong to the remaindermen because made out of capital and the other half would belong to the life tenants, under the rule of Bryan v. Aikin.
But on the next day (October 1) the statement of assets and liabilities of the New Jersey company showed an entirely different surplus. It then showed a surplus, called profit and loss on the statement, of $59,107,916.11, enough to warrant a 200 per cent. stock dividend to the common stock payable out of the surplus without any intrenchment upon capital. The manner in which this doubling of surplus over night was accomplished was as follows: The Delaware company immediately upon the closing of the sale made up a statement of assets and liabilities. This statement corresponded in substance in every particular with the statement which had on the day before been made up by the New Jersey company, except in one item. The statements made by the two companies undertook to reflect the condition of the identical assets and liabilities, which certainly had not changed over night. They did so, in practically every itemized particular with the one exception referred to. That exception was the asset item, "Contracts, $29,152,116.75." This item, absent from the New Jersey company's statement of September 30 and appearing in the Delaware company's statement of October 1, supplied an asset value against which capital stock of the Delaware company could be issued in an amount in excess of the capital stock which the New Jersey company could theretofore have issued on the strength of the financial condition of the assets and liabilities as shown .by its own statement when the same were in its hands. And so, when the New Jersey company received the stock of the Delaware company in exchange for the business, the former found itself in possession of assets consisting of Delaware company's stock which when valued at par gave it a surplus of profit and loss which was nearly twice in amount what its surplus showed when it had held the assets themselves which the Delaware company's stock now stood in place of.
This being the situation, the question arises as to whether, in a case of the instant sort, where the controversy is between life tenants and remaindermen, a dividend in so far as it is declared out of that portion of surplus so constituted can be said to have come entirely out of the net earnings of the corporation. I think not. There is nothing to show that $29,152,116.75 had, at the time of the dividend, been earned on these contracts. The financial statements of both companies show a liability of $86,127,552.59 on account of "contract advances." The New Jersey company on September 30 claimed no asset value by reason of these contracts. It recognized as did the Delaware company a liability on account of unearned advances. But the Delaware company set up an asset value as stated of over $29,000,000 arising out of these contracts, which was the same thing as reducing by an equivalent amount the amount of liability due to unearned advances thereon. If in fact the $29,000,000 plus had been earned by performance pro tanto of the contracts, I do not see why, instead of showing the fact by an asset entry, it was not shown by an appropriate reduction of the liability item. In the absence of a showing that $29,152,116.75 had in fact been earned, I must conclude, the liability for contract advances remaining the same, that that portion of the 200 per cent. dividend which rested upon this amount of the surplus cannot be said to have found its source in earnings and must go to-the corpus. That portion of the 200 per cent. which rested *Page 159 
upon surplus as shown by the New Jersey company's statement of September 30, is, however, traceable to earnings and belongs to the life tenants.
This conclusion is reached on the view that what took place on October 1, 1925, was in reality a reorganization of the New Jersey company. But if the transaction is to be regarded otherwise as was held in U. S. v. Phellis, supra, the result for the purposes of this case is the same. For in that event we are to think of the old New Jersey company as selling out its business with the intention of liquidating its affairs which in fact it gradually did. Regarding the matter in this light, we have then a case which falls into the class of cases above referred to, where a corporation engages in distribution of its assets in process of liquidation and where it is held that courts in passing upon the rights of life tenants and remaindermen must still look to the sources of the distribution for determination of the rights of those who claim it. The sources of the distribution are the same however the transaction of October 1, 1915, is to be regarded. And so in any way of looking at the matter the conclusion just announced, it would seem, is the correct one.
It is contended by some of the defendants that the entire 200 per cent. dividend must be treated as a part of the principal. If this were done, then the entire $29,995,799.36 (less a small amount) which was shown by the New Jersey company's statement of September 30 as profit and loss surplus would in effect be turned into permanent capital. This would be unjust to the life tenants who are entitled as against remaindermen to have all the earnings when turned over to stockholders regarded as income. Bryan v. Aikin, supra. Such a capitalization of the new Jersey company's surplus would forever remove the earnings represented by it beyond the reach of dividend distribution to stockholders. It would take it completely away from the life tenants who are entitled to earnings when distributed and by the same token would hand it over to the remaindermen. Such a result is as objectionable when done indirectly by the medium of the sale that was effected as it would be had the New Jersey company directly declared a 200 per cent. stock dividend payable in its own stock.
It is contended by others of the defendants that the 200 per cent. stock dividend is to be regarded as belonging entirely to income. This contention is equally untenable. It seems to be founded on the idea that the stock upon which it was declared was derived for the most part from parent stock which the appraisers of Mr. Du Pont's estate valued on March 31, 1903, at nothing, and that anything above nothing which it eventually yielded was income. This view is more plausible than sound. It overlooks the fact that while the appraisers regarded the original stock as valueless, yet the corporation did not. On August 31, 1903, shortly after the appraisers' report, the company's statement gave it a book value of $108.89 a share. The judgment of the appraisers of the estate cannot be accepted as controlling against the values which the stockholders through their chosen officers gave to the assets where the controversy is such as we have here. Let it be assumed that the corporation's appraisal of its assets was exaggerated. It is not contended by any of the parties that the assets had not on September 30, 1915, come up to the claimed value. So far as appears the assets may have increased in value simply by the natural growth and increase of the company's permanent property. If so, such increase is not income but capital. Bryan v. Aikin recognizes this principle and cites with approval in support of it Kalbach v. Clark, 133 Iowa, 215,110 N. W. 599, 12 L.R.A. (N.S.) 801, 12 Ann. Cas. 647. See; also, In re Mc-Keown, supra.
If the contention is sound that the entire 200 per cent. dividend is income and not principal, then the result is that the trust estate ceased on October 1, 1915, to have any continuing share or interest in the powder business, for the life tenants would be the stockholders in their own right. All that the trust estate would have had left would be common stock of a non-active company which was substantially in process of liquidation, and which on final liquidation could pay to such common stock only the debenture stock of the new company on a share for share basis. Certainly it is out of all reason to say that when the 200 per cent. dividend was paid, this trust estate was ousted from all subsequent connection with the business which it had theretofore been interested in. It seems impossible to think that the sale in 1915 had the effect of sending the business forward into the future with the trust estate left behind in its wake with no further touch or contact with it.
Having indicated from the foregoing how the 200 per cent. dividend of 1915 is to be treated, I now proceed to take up for consideration the other three dividends. These may be disposed of in short order. They fall clearly within the rule of Bryan v. Aikin and go to the life tenants as income. The statement of facts shows them to be typical stock dividends declared out of earnings without diminishing the trust principal in any way.
Before concluding this opinion I must notice a contention made with respect to the Du Pont dividend of 40 per cent. declared in 1925. Something is sought to be made by the solicitor for the defendants who are minors, out of the fact that the board of directors, before declaring that dividend, increased the asset value of General Motors Company stock which the Du Pont Company held and carried in large amounts, from its cost value to $36,285,893.27 in excess thereof. The surplus of the company was increased by this *Page 160 
amount, and the board resolved "that the surplus so increased be in part capitalized by a stock dividend," and in the same resolution proceeded to declare a dividend of 40 per cent. payable in common stock.
It is suggested that the 40 per cent. dividend declared in this manner must in part at least be attributed to a growth in value of the General Motors stock and that this being so the dividend cannot be said to represent earnings at least to the full extent of its face. It is to be noted however that without an increase in the asset value given to the General Motors stock there was ample accumulation of earnings to cover the 40 per cent. dividend. I can see no reason for assuming that a part of the 40 per cent. dividend must be charged against that particular part of the surplus that represented the General Motors increased valuation. The dividend did not purport to be a capitalization of the General Motors increment. It was declared out of "the surplus so increased." So long as the surplus as an entirety had in it enough of earnings to support the dividend declared, it would seem that the life tenant should receive it. If later stock dividends are declared which must draw on the General Motors increment for their support, it will be in order for the remaindermen to make the claim at that time that the same should be kept in the corpus. Whether in such an event the claim would be a sound one, does not now need to be decided.
The solicitors may agree if possible on a form of decree embodying the conclusions herein expressed. After allotting the portion of the 200 per cent. dividend which goes to the life tenants as income and to the estate that part which goes as corpus, the subsequent stock dividends declared on the Du Pont stock will of course follow the shares thus allotted. If the solicitors cannot agree on the terms of the decree, a further hearing will be accorded them.
 *Page 698