# Rice Estate

*Smith & Cahill* and *Ballard, Spahr, Andrews & Ingersoll,* for accountants.

*Wright, Mauck, Hawes & Spencer* and *Cravath, Swaine & Moore,* for income beneficiary.

*Russell J. Brownback* and *Roger B. Reynolds,* for contingent remaindermen.

TAXIS, P. J., February 24, 1956.—The first account of Eleanor Widener Dixon and George D. Widener, two of the testamentary trustees for Alexander Hamilton Rice, was examined and audited by the court on June 22, 1955. . . .[1]

---

[1] The account is erroneously styled the "Third Account of Alexander Hamilton Rice, Eleanor Widener Dixon, and George D. Widener, testamentary trustees". There have been no prior court accountings. Two earlier accounts entitled "First" and "Second" have been stated between the parties in interest.

Eleanor Elkins Rice died in Paris, France, on July 13, 1937, a resident of Newport, R. I., leaving a will dated September 21, 1935, and codicils dated April 27, 1936, and May 18, 1936, all duly probated in Rhode Island. She named as her executors and trustees her husband, Dr. Alexander Hamilton Rice, her daughter, Eleanor Widener Dixon, and her son, George D. Widener. Mr. Widener is a resident of this county. Mrs. Dixon is a resident of Philadelphia County, and Doctor Rice, as he describes it, is a resident of New York City, Newport, R. I., and Paris, France.

The residuary clause of the will here pertinent provides that: "All the rest, residue and remainder of my estate, real and personal, I give to my trustees hereinafter named and to the survivor and survivors of them, IN TRUST, NEVERTHELESS, for the uses and purposes and with the powers following:

"(a) In Trust, to pay over the entire net income thereof at convenient intervals, to my husband, Alexander Hamilton Rice, so long as he shall live.

"(b) In Trust, upon the death of my husband to divide the principal thereof equally between my two children, Eleanor W. Dixon and George D. Widener and their issue."

Mrs. Dixon has two children who are of age, Eleanor D. Gentle and Fitz-Eugene Dixon, Jr. Mr. Widener has no issue.

The inheritance tax certificate shows that an investigation for Pennsylvania tax liability has not been completed, and request has been made that any award be subject to Pennsylvania inheritance tax found to be due.

The account actually filed contained an error of $1,275.21 in the statement of the amount of the trust tax chargeable against income. Since that error changed a number of figures in the account, it was agreed by the parties to substitute a corrected account.

The first and final account of Alexander Hamilton Rice, Eleanor Widener Dixon and George D. Widener, as executors, was filed in and was examined and audited by the probate court of Newport, R. I., the decree of confirmation of said account having been entered on June 15, 1942. No appeal was filed within the time provided by law from the entry of the decree of said June 15, 1942. The decree of confirmation and award of the residuary estate as therein made to the trustees became absolute at that time. Certified copies of the records of the court of probate of the City of Newport were filed at the audit of the present account and are a part of the record. Since the settlement of the executors' account in 1942, the trustees' functions have devolved largely upon Mr. Widener, who attends to the accounting and custodial details at his office in Philadelphia, and the investments of the trust are lodged in bank vaults in the building where he has his office.

The present account is filed by Eleanor Widener Dixon and George D. Widener, two of the testamentary trustees, and objections were filed to it by Dr. Alexander Hamilton Rice, the other trustee. Doctor Rice, therefore, has not joined in this accounting. The account came on for audit and hearing on June 22, 1952, at which time testimony was taken upon the objections and the other questions raised, and extensive exhibits were introduced into evidence. After the transcription of the notes of testimony, argument was held on September 8, 1955. The children of Mrs. Dixon had also filed objections to the account, and the objections now before the court for disposition fall into three basic categories, as follows:

(1) Allocation of certain capital gains to principal. The objector is Doctor Rice.

(2) Allocation of 1954 income tax to income. The objector is Doctor Rice.

(3) Trustees' improper reimbursement to Doctor Rice of $170,000 out of principal. The objectors are Eleanor D. Gentle and Fitz-Eugene Dixon, Jr., grandchildren of testatrix and contingent remaindermen of the trust.

*Jurisdiction*

At the threshold, the court must determine whether it has jurisdiction to proceed further. Has it the legal power to dispose of the controversy so fully laid before it? This is quite a different question from that of determining what law applies to the interpretation of the will. Regardless of what law applies, has this court sufficient control of the parties or of the trust res to make decisions which would bind the parties? The court must decide that question even though it is not raised by litigants.

I have no doubt of the answer. Two of the three trustees live in Pennsylvania and the one who has the most active role in the management of the trust lives in this county. Therefore, this State has jurisdiction, and this county is the appropriate venue for disposition of the case. Furthermore, the courts of Rhode Island did not, in their adjudication of the executors' account, in any way indicate that the trustees were to be answerable there in the future. Consequently there are no considerations of comity requiring this court to defer, in the exercise of jurisdiction, to the courts of Rhode Island.

*Trustees' Improper Reimbursement To Dr. Rice Of $170,000*

It will be easier to discuss the third classification initially since it is uncomplicated and may be stated briefly. The account shows that the accounting trustees paid $170,000 out of principal to Dr. Rice during 1954, allegedly to reimburse him for certain improvements to the trust real estate at Newport, Rhode Island,

which Dr. Rice and his present wife now occupy. Mrs. Dixon's children, as contingent remaindermen, take the position that this $170,000 payment was made as a part of an over-all family settlement of all claims which Dr. Rice might have had against the trust corpus, that if Dr. Rice prevails in his first objection the payment to him is unjustifiable, with the result that the trustees should be surcharged. This court is further advised that should Dr. Rice fail in his first objection, then the objection of these contingent remaindermen may be dismissed.

*Allocation of Certain Capital Gains To Principal*

Dr. Rice, in his first objection, complains about the failure of the accounting trustees to credit income with that portion of capital gains realized in 1954 on the sale of common stocks. The amount of Dr. Rice's claim is approximately $180,000 out of total capital gains of approximately $400,000. Dr. Rice proceeds on the theory that this $180,000 represents income under the Pennsylvania law of apportionment, which he deems applicable, rather than the law of Rhode Island, the State of decedent's domicile. The accounting trustees' reply, in opposition, is that the claim of Dr. Rice is barred by a family agreement, and that, in any event, Rhode Island law governs and under the applicable Rhode Island law all gains are treated as principal following the Massachusetts rule.

*Allocation of 1954 Income Tax to Income*

Dr. Rice, in his second objection, complains that on page 18 of the account under the heading "Income Disbursements" appears the following item:

"INCOME TAX—Transferred to reserve for 1954 Federal income tax, $100,551.84."

Dr. Rice complains that this is an unauthorized and unlawful charge against income.

The account indicates that the accounting trustees sold various stocks and one parcel of real estate during the period from May 7 to August 5, 1954, at prices which represented a gain of $436,347.70, that the accounting trustees sold other securities during the period from May 7 to May 19, at prices which show a loss of $40,152.28, the net result of which is a total gain during the period mentioned of $396,195.42. The Federal income tax (capital gains tax) payable in respect to that gain is at the rate of 25 percent and amounts to $100,551.84, i.e., the amount which is shown in the account as having been transferred out of income to create a reserve for this 1954 Federal tax. Dr. Rice argues that the provisions of the Internal Revenue Code of 1954 impose that tax upon the trust as distinguished from the income beneficiary. The accounting trustees reply that since Dr. Rice received the benefit of deductions for tax purposes which theretofore had been granted to corpus, he should bear the burden of the tax.

*Allocation of Capital Gains to Income*
*Family Settlement*

I shall first discuss the objection pertaining to the allocation of capital gains to principal. Most, if not all of the facts hereinafter related are taken from: (1) Stipulations of the parties; (2) exhibits introduced into evidence and (3) the testimony of Schofield Andrews, Esq., partner in the law firm of Ballard, Spahr, Andrews and Ingersoll, and counsel for the accounting trustees and for the remaindermen.

The accounting trustees contend that Dr. Rice's claim for a portion of the capital gains is barred by a family agreement or family settlement among the parties; that if he is not barred by this family agreement, then, in any event, the law of Rhode Island applies, and that capital gains under Rhode Island law are retained in corpus.

The full import of the family settlement can only be obtained by a review of the circumstances in which this settlement developed. At the outset it is important to observe, first, that the settlement of the various disputes or difficulties between Dr. Rice, life tenant, and his stepchildren, the remaindermen, who are also the accounting trustees, is not set forth in one formally executed instrument (nor is this fatal—see Follmer's Appeal, 37 Pa. 121, 124), but rather that the many problems and difficulties were discussed and agreement reached over a period of time primarily between the years 1952 and 1954, in addition to the formally executed agreement of August 3, 1954. This is important because some of the arguments presented by Dr. Rice on this phase of the case disclose a "frame of reference" which ofttimes is too narrowly confined. Second, it must be remembered that throughout the negotiations Dr. Rice was, at all times, represented by John Rice, Esq. (Dr. Rice's brother), and Earle W. Carr, Esq., of the Boston law firm of Gaston, Snow, Rice & Boyd.

*(1) Family Background and History*

Prior to her marriage to Dr. Rice, Mrs. Rice was the widow of George D. Widener, who perished in the sinking of the Titanic in 1912. She and Mr. Widener, with their three children, Harry E., George D. and Eleanor Widener Dixon, lived together in the home of her father-in-law, P. A. B. Widener, in this county. After her husband's death, she and her family continued to live in this county. On October 6, 1915, she, then 54 years of age, married Dr. Alexander Hamilton Rice, age 40, at Newport, Rhode Island. After their marriage Doctor and Mrs. Rice lived for two years in Boston and thereafter made Newport their principal residence and legal domicile. Mrs. Rice then owned a house in Newport known as Miramar, and Doctor and

Mrs. Rice also had an apartment in New York, a home in Palm Beach, Florida, and subsequently, an apartment in Paris, France, which Mrs. Rice later gave to Dr. Rice. Never again did Mrs. Rice live in Pennsylvania. As mentioned, Mrs. Rice died in Paris, France, on July 13, 1937. Her body was returned for a church funeral in New York City, and interment was in her family vault in Philadelphia

On December 30, 1922, Mrs. Rice had transferred approximately $6,000,000, which represented substantially one half of her total wealth, in trust, inter vivos, the income from which was given to Dr. Rice for his life and on his death the principal to go to Mrs. Rice's two children, Mrs. Dixon and Mr. Widener. Dr. Rice has received income from this trust of approximately $225,000 per year since its creation. The trust instrument provided that principal should revert to Mrs. Rice if she survived Dr. Rice. It was this possibility of reverter provision which after her death created serious tax difficulties related hereafter and which created, secondarily, the seeds of dispute from which germinated the problems now before this court.

Mrs. Rice left her residuary estate to her executors, as trustees, Dr. Rice to receive the income for life and her two children and their issue to share the principal on his death. From 1922 on, Dr. Rice has received income from one half of Mrs. Rice's wealth, and from 1937 to date has received income from all of Mrs. Rice's wealth. In due course the Federal estate tax was filed, but the 1922 trust was not submitted as part of the gross estate on the ground that the tax laws did not subject it to tax. However, the United States Treasury took a contrary view and concluded that the 1922 trust was subject to Federal taxes because of the possibility of reverter to Mrs. Rice. Accountants were able, however, to have only $3,700,000 included in the

gross estate from the 1922 inter vivos trust, rather than the full $6,000,000 of the principal.

After extensive negotiations, the executors, in 1941, paid a tax amounting to $2,800,000 on the 1922 trust. Immediately upon payment, the executors proceeded to seek a refund of this tax taking the view that the government was in error. Their claim for refund was immediately rejected by the government. The accountants, however, kept their claim for refund alive by the institution of a suit in the United States District Court in Providence, Rhode Island, in April, 1946, just shortly before the two year statute of limitations for refund would have barred their claim

No purpose will be served in relating the vicissitudes of the "possibility of reverter" tax cases in the courts. Suffice it to say, that in Spiegel v. Commissioner, 335 U. S. 701, the United States Supreme Court carried the reverter doctrine to the point that any possibility of reverter, no matter how remote, would require inclusion of the transferred property in gross estate. Subsequently, in relief of this view, Congress included in the Internal Revenue Code of October 20, 1951, sec. 607, 65 Stat. at L. 452, which, it was believed, would grant relief to the accountants. Thereafter the petition for refund came before the district court, and argument was held on September 15, 1952, in Providence, Rhode Island. Dr. Rice was represented at that hearing by his personal counsel, Earle W. Carr, Esq. At that time, after oral arguments, Mr. Carr urged the settlement of the refund claim at once on a 60 percent basis, and such an offer was made to the government with Dr. Rice's concurrence.

*(2) 1952*

After the argument in the United States District Court in Providence, Rhode Island, on September 15, 1952, negotiations to settle the tax difficulties con-

tinued, with the fullest coöperation and accord of Dr. Rice's personal counsel. As negotiations progressed, the question of counsel fees in the tax case also became involved. On November 26, 1952, a memorandum was sent to Mr. Carr for Dr. Rice by Schofield Andrews, Esq., counsel for the accounting trustees: Exhibit 8. This memorandum is significant because many of the disputes and differences between the parties come into focus for the first time.

Six points of difference were discussed in the memorandum, briefly described as follows:

1. All parties would agree that the estate should, if possible, settle the tax case for a recovery of 60 percent of the tax and interest paid.

2. Counsel fees should be 15 percent of the recovery.

3. Dr. Rice's stepchildren were to be "assured that all related questions and all possible questions concerning administration of their mother's estate and her trust for Dr. Rice are settled at the same time."

4. All parties would agree that the estate sell common stocks at capital gains sufficient to offset counsel fees chargeable to the trust principal, and would agree to reinvest the proceeds of these sales, plus the tax refunds, in tax exempt securities.

5. An account of the trust under decedent's will and an account of the trust under the inter vivos deed of trust of 1922 would be approved and signed by the parties.

6. Mrs. Rice would sign a quit-claim deed to the trust real estate at Newport, Rhode Island.

On December 15, 1952, counsel for Dr. Rice replied to this November 26, 1952, memorandum and stated that these proposals were:

". . . entirely satisfactory to Dr. Rice," although "Mrs. Rice states that she is not willing to quit-claim . . . Doctor Rice very much appreciates the effort be-

ing made to arrive at a settlement which will be of some benefit to him during his lifetime": Exhibit 9.

*(3) 1953*

Early in 1953, the 60 percent settlement offer was formally submitted to the Department of Justice. At the time the offer was submitted, counsel for the trustees wrote to counsel for Dr. Rice that:

". . . We are forwarding a formal offer of compromise of the estate tax case to Washington on the basis stated in my memorandum of November 26th. We are taking this action in reliance upon Dr. Rice's statement to you, as reported in your letter to us of December 15th, that the basis of settlement set forth in the memorandum [November 26, 1952] is entirely satisfactory to him, except that Mrs. Rice is not willing to give the quit-claim deed with respect to the Newport property which is mentioned in Section 7 of the memorandum": Exhibit 13.

Mr. Carr, by a letter of January 15, 1953, communicated the exact text of this understanding to Dr. Rice with this comment of his own: "The above correctly states the situation as I understand it": Exhibit 14.

A substantial part of the year 1953 was engaged in attempting to negotiate a compromise with the United States Government. At this point the understanding of Dr. Rice and his cotrustees (acting principally in their alternate roles of life tenant and presumptive remaindermen) would appear to be quite clear. The situation with respect to their agreement seems to have become less clear, however, when the 60 percent offer was rejected by the Department of Justice. The government intimated at that time, however, that a 40 percent offer might be satisfactory to the government. On December 24, 1953, in a letter from Mr. Carr to Dr. Rice, he intimated that a 40 percent settlement is preferable to trial and referred

specifically at that time to other matters in dispute as set forth in the November, 1952, memorandum explaining how, in certain parts, the understandings reached in the 1952 memorandum would be changed if the 40 percent offer were made to the government and accepted. He states in part as follows:

"It is my understanding that the attorney fees will be as stated in the enclosed memorandum except that:

"(1) The fee of Ballard, Spahr, Andrews & Ingersoll, being on a percentage basis, will naturally be lower because the settlement figure is lower.

"(2) The fees stated do not include a fee for Rhode Island counsel for collecting the Rhode Island refund.

"(3) As I wrote you sometime ago, I have suggested a fee for my firm of $5000 to be paid out of the recovery and allocated along with the other fees": Exhibit 27.

No other changes were made in the memorandum nor was there any change in the assurance that all possible questions concerning the administration of the mother's estate were to be settled. The investment of the capital gains program also was not modified.

Mr. Carr, on December 31, 1953, wrote again to Dr. Rice to reconfirm the 40 percent settlement as definitely in the interests of Dr. Rice. In parts pertinent, the letter reads as follows:

"As I have written you before and said to you over the telephone, I think the 40 percent settlement is definitely in your interest and I think you should accept it. . . .

"I enclose a brief memorandum as to how the proposed 40 percent settlement will work out for you. It shows that whereas a 60 percent settlement would have produced a net for you after taxes of about $200,000, a 40 percent settlement will produce about $135,000. This is, of course, the direct benefit to you apart from

the increase in the trust principal which will increase your income from the trust. In your telephone conversation with me you indicated some concern about the attorneys fees set forth in Mr. Andrews' memorandum of November 26, 1952. I estimate that if these attorneys fees were cut in half, your net recovery on a 40 percent settlement would be increased by only $16,-000": Exhibit 28.

*(4) 1954*

Dr. Rice, in the early part of 1954, expressed his dissatisfaction with more features of the 1952 memorandum than the change of settlement offer from 60 percent to 40 percent. Mr. Carr indicated that he had further talks with Dr. Rice as a result of which Dr. Rice finally agreed to go along with the 40 percent settlement, but indicated that Dr. Rice wanted three other matters to be discussed and agreed upon as follows:

1. Dr. Rice asked $184,076.99 reimbursement from the principal of the trust for alleged expenditures representing capital improvements made by him on the Newport property owned by the trust and occupied by Dr. Rice.

2. Dr. Rice asked also that the Coggeshall Avenue property be conveyed to him by the trust without consideration.

3. Dr. Rice asked also that the presumptive remaindermen of this trust make him an offer to purchase his life estate.

It is important to note at this juncture that these were three additional points not previously discussed, and were in addition to those set out in the 1952 memorandum; and, note also that there was no disagreement on the point that counsel fees should be paid from principal and that the proceeds of the sale of common stocks should be invested in tax exempt securities. On

March 3, 1954, a formal proposal was made by Mr. Carr on behalf of Dr. Rice as follows:

"I am authorized by Dr. and Mrs. Rice to state that they will approve the estate tax settlement including the amount and allocation of attorneys fees previously discussed (as reduced by reason of the reduction of the settlement from 60 percent to 40 percent) on the following basis:

"(1) Dr. Rice will be reimbursed for capital expenditures on the Newport properties in the amount of $184,076.99 . . . out of the principal of that trust.

"(2) Dr. Rice will purchase the Coggeshall Avenue property at . . . $26,025.28.

"(3) Mrs. Rice will execute a release of her dower interest in Miramar": Exhibit 31.

Subsequently, as a result of extensive negotiations and strenuous efforts, a tax refund of approximately $1,000,000 was recovered for the principal of the trust in 1954, and an additional $628,000 tax refund was recovered for Dr. Rice, of which $121,000 was tax free to him because it represented interest paid by this estate in 1941 without tax benefit.

At this point the matter was then considered by all parties as agreed to and closed and that nothing further remained to be done except to hold a meeting to exchange deeds and checks. The investment program was initiated in April, 1954, with Dr. Rice joining in the stock transfers, with the complete approval of his counsel.

On April 22, 1954, Mr. Carr, counsel for Dr. and Mrs. Rice, in preparation for the meeting of closing, sent to them a letter, which is as follows:

"Gaston, Snow, Rice & Boyd

"April 22, 1954

"Dr. and Mrs. A. Hamilton Rice,
901 Fifth Avenue,
New York, New York.

"Dear Dr. and Mrs. Rice:

"In order to support the agreed reimbursement to Dr. Rice of $167,986.67 on account of Newport capital expenditures Mr. Andrews has asked for a brief statement signed by Dr. Rice. I enclose such a statement which I think is in proper form. If you will agree, will you sign the original and return it to me for transmittal to Mr. Andrews. The copy is for your files.

"I received today from Mr. Andrews check for $5000 from the Trustees under the will of Eleanore Elkins Rice which is being charged against income on the trusts' books. This is in accord with previous plans which you have approved.

"I quote below two paragraphs from Mr. Andrews' letter to me dated April 21.

" 'As I told you, the Edwards & Angell firm is drafting a consent to be attached to the Trustees' deed to Dr. Rice for the Coggeshall Avenue property. The consent will be signed by George Widener and his wife; Mrs. Dixon; and Mrs. Dixon's two children and their respective spouses. Walter Edwards, with whom I talked, thinks this is a sound practical solution which will avoid any necessity of application to a court.

" 'You will note that the Trustees' deed omits a piece of land on Murray Place described as being "retained" by the Trustees. I understand this piece was omitted by White from his appraisal and for this reason omitted from the deed. If the omitted piece is unimportant, as I think is the case, I will have it included to avoid argument now and hereafter.'

"The first paragraph relates to a question Mr. Edwards raised concerning a legal difficulty arising by reason of the fact that Dr. Rice will be both a grantor and grantee of the Coggeshall Avenue property. The consent by the remaindermen is designed to eliminate any difficulty on that score. The second paragraph

raises the question whether the Murray Place parcel should be included as part of Coggeshall Avenue.

"I suggest that you send a copy of the two paragraphs quoted above and my comment above to Mr. Cross' office if that is where you are having the proposed deeds checked.

"Mr. Andrews proposes a meeting with you in New York at which time I assume the following would occur:

"(1) Dr. Rice would assent to the account now in process of preparation which will disclose in particular the receipt of the Federal estate tax refund and its disposition, the reimbursement of capital expenditures and the sale of Coggeshall Avenue.

"(2) Mrs. Rice will execute and deliver to Mr. Andrews the quit-claim deed to Miramar.

"(3) Mrs. Andrews will deliver to Dr. Rice the executed deed to Coggeshall Avenue.

"(4) Mr. Andrews will deliver to Dr. Rice a check for his share of the Federal estate tax refund plus reimbursement for capital expenditures as agreed upon less the $25,000 purchase price of Coggeshall Avenue and Dr. Rice's $31,000 note which will be surrendered to him.

"Mr. Andrews suggests that I attend this meeting to look after your interests. I will be glad to do so if you want me to. Mr. Andrews suggests any day of the week beginning May 3 except May 4. May 5, 6 or 7 would be preferable to me since I have to go to Kansas City April 28 and am not sure I will be back by May 3. Mr. Andrews asks me to make a definite appointment with you so engagements may be arranged accordingly.

"If you agree with this procedure will you please let me know as soon as possible what day would be suitable to you?

"Sincerely yours,
/s/ Earle W. Carr"

"Enclosures

It would seem, therefore, that there was on April 22, 1954, a complete meeting of the minds and a contractual obligation effected among the parties which, as Mr. Carr's letter clearly indicated, remained but to be carried into execution. Moreover, the obligation was based on all the terms of the original 1952 memoorandum, amended only in one respect, namely, that the tax settlement be at the rate of 40 percent instead of 60 percent, and supplemented in two further regards in that Dr. Rice would receive $167,986.67 for reimbursements to Newport property, and would receive the Coggeshall Avenue property for $25,000. It was made abundantly clear by Dr. Rice's counsel and the letter of April 22, 1954, that the family settlement had been consummated and had only to be put into effect.

On May 10, 1954, however, Dr. Rice took matters into his own hands, and wrote a letter to Mr. Widener, his stepson, repudiating four of the points, but saying: "I think we can agree on most points." The four points in which he disagreed in his letter of May 10, 1954, were:

1. To not agree that the 15 percent fee of counsel for the trustees should apply to the Rhode Island tax refund although, on March 3, 1954 counsel for Dr. Rice had indicated approval thereof.

2. Dr. Rice said he would not agree to the reimbursement of the Newport expenses being taken from principal, although the letter of March 3, 1954, likewise authorized reimbursement from principal.

3. Dr. Rice also disagreed with the $25,000 price for the Coggeshall Avenue property, although Dr. Rice's attorney, by letter of April 14, 1954, was instructed by Dr. and Mrs. Rice to fix the price at $25,000.

4. Dr. Rice repudiated his assent to the 40 percent settlement of the estate tax refund.

It is important to note that Dr. Rice did not retract any other points upon which he had previously agreed. On the contrary, he joined his trustees in the sale of common stocks at gains and reinvestments in tax free bonds, and Mr. Carr, on June 3, 1954, wrote to counsel for the remaindermen in part as follows:

"I am glad to know that the Rhode Island refund has been received and that the investment program is under way. It seems to me that the shift into tax-exempts will be quite beneficial to Dr. Rice particularly since it could be done at a time when capital gains were absorbed by deductible charges against prinicpal": Exhibit 41.

These four points remained in a state of uncertainty until July 22, 1954, when Schofield Andrews, Esq., as counsel for the accounting trustees, met with Dr. and Mrs. Rice in Providence, Rhode Island. All these four points were discussed and explained to Dr. Rice and his wife, and Dr. Rice's objections were then withdrawn, with no changes in the agreement previously reached other than that the reimbursement figure for Newport expenditures was increased to $170,000. At that time it was clear that the parties had intended a full and complete family settlement of all their differences, and was so understood by all the parties.

Finally, at a meeting on August 3, 1954, the execution of the agreement was concluded. An instrument captioned "Approval and Release by Alexander Hamilton Rice" (Exhibit 45), was executed by Dr. Rice at that time. There was no further written mention at this settlement of matters previously agreed to and carried out by action in which Dr. Rice participated.

The instrument of August 3, 1954, reads in full text, as follows:

"ESTATE OF ELEANORE ELKINS RICE

"Approval and Release by Alexander Hamilton Rice

"1. I hereby approve the settlement by the Executors under Mrs. Rice's will on a 40 percent recovery basis of their suit in the United States District Court in Rhode Island for refund of so much of the additional Federal Estate Tax and interest thereon paid by them in 1941 as is attributable to inclusion of Mrs. Rice's 1922 Trust as a part of her taxable estate; the transfer by the Executors to the Trustees of the residuary trust under Item 5 of Mrs. Rice's will without accounting therefor in Rhode Island, of the sum of $1,396,910.64 which the Executors received pursuant to such settlement; the allocation by the Trustees of $769,057.33 thereof to principal of the trust, this sum being 40 percent of such additional Federal Estate Tax paid by the Executors in 1941; and the allocation by the Trustees of the balance of $627,853.31 to income of the trust, of which sum $121,479.46 represents 40 percent of the interest paid by the Executors in 1941 and $506,373.85 represents 40 percent of the interest accrued on the additional tax and interest paid by the Executors in 1941.

"2. I also approve payment by the Trustees of counsel fees for services related to the foregoing refund from 1941 to date, as follows: to Ballard, Spahr, Andrews & Ingersoll an amount equal to 15 percent of the refund or $209,536.60, of which $115,358.60 shall be charged against principal of the trust and $94,178 against income; to Williams, Myers & Quiggle the sum of $50,000, of which $30,000 shall be charged against principal of the trust and $20,000 against income; to Earle W. Carr the sum of $5,000, all of which shall be charged against income of the trust.

"3. I also approve the transfer by the Executors to the Trustees and the allocation by the Trustees to principal of the trust, also without accounting therefor in Rhode Island, of the sum of $240,630.43 which the

Executors received as a refund from Rhode Island on account of additional Rhode Island Inheritance Tax paid in 1941, and I approve payment by the Trustees from principal of the trust of counsel fees for services related to the refund from 1941 to date, as follows: to Greenough, Lyman & Cross the sum of $25,000; to Ballard, Spahr, Andrews & Ingersoll the sum of $31,094.56.

"4. I have requested payment of $170,000 from the principal of the trust to reimburse me for capital expenditures to August 1, 1954 for preservation of the property at Newport, Rhode Island, which is a part of the principal of the trust and in which I have a life interest. I approve the application by the Trustees of $25,000 of this sum to payment for the premises at Newport west of Coggeshall Avenue and on Murray Place which I have purchased from the Trustees, and acknowledge payment by Trustees' check of the balance of $145,000, which I accept in full satisfaction of all rights I may have to reimbursement on account of such expenditures.

"5. I approve the pension payments which have been made to August 1, 1954 to Miss Powell and Miss Patterson from the income account of the trust, but only on condition that no payments from the income account of the trust shall be made to either of them after such date.

"6. I give the foregoing approvals individually and as an Executor and a Trustee under Mrs. Rice's will, and I hereby release and discharge George D. Widener and Eleanor Widener Dixon, individually and as Executors and Trustees under Mrs. Rice's will, their heirs, executors, administrators and assigns, of and from all claims and demands whatsoever in respect of the matters to which I have given my approval herein.

"IN WITNESS WHEREOF, and intending to be legally bound hereby, I have hereunto set my hand and seal the 3rd day of August, 1954.

"(Sgd) Alexander Hamilton Rice (Seal)"

A mere recital of the negotiations which took place establishes the difficulties encountered in attempting to bring about agreement on a variety of disputes which inter se were not at all related.

For example, Mr. Carr wrote on June 3, 1954, in part as follows:

"I have not been consulted by the Rices on any matter involving the Rice estate since the exchange of letters between Dr. Rice and George Widener [May 10, 1954 letter]. Very possibly I will not be consulted and I am not sure that I want to be. I will be happy to help Dr. Rice in any proper way I can, but another type of attorney might be more useful in attempting to carry out whatever Mrs. Rice has in mind.

"I can easily imagine the contents of Mrs. Rice's letter to George Widener. I have had several castigations from her in the last year or two. It is very difficult for me to understand why she turned down what I think was a very handsome settlement and then proceeds (probably) to insure that the matter cannot be reopened": Exhibit 41.

Moreover, it is plain beyond any possible doubt that the payment by the accounting trustees to Dr. Rice out of principal of the sum of $170,000, representing reimbursements of Newport expenses, had little merit, for, as everyone agreed, they were supported by proof of the flimsiest sort. The perfectly obvious answer is that this was a part of a broader consideration to him than was his mere claim for this personal reimbursement. A reading of the testimony and the exhibits in this case leaves me without peradventure of doubt, and I find, as a fact, that the parties intended that

all matters of difference be settled between them, and that they were in fact so settled and agreed upon. The recantation by Dr. Rice is entitled to little consideration.

The court is convinced that, entirely apart from anything else, Dr. Rice did, by word and conduct, personally and through his then counsel, Mr. Carr, agree to the realization of principal gains and the investment of the entire proceeds in principal. To allow Dr. Rice now to raise a claim for $180,000 out of principal after he has already been paid $170,000 for alleged improvements to the Newport property, would be contrary to every assumption on the basis of which the parties came to final terms on August 3, 1954, and would also offend the equitable sensibilities of this court.

After a careful consideration of all the evidence, the exhibits submitted, and the testimony of the witnesses, I conclude that the approbation of the court must, in all fairness and equity, be impressed upon the family settlement between the parties, that Dr. Rice's claim for a portion of the capital gains is barred by this family agreement, and his claim is, therefore, dismissed.

*Conflict of Laws—Rhode Island Law—Capital Gains*

Although I have dismissed the objection of Dr. Rice concerning the allocation of capital gains to principal on the ground that the family settlement bars his claim, laying aside the family agreement for the moment, I am further of the opinion that his claim must fail for another reason, namely, that the law of testatrix's domicile, Rhode Island, is the applicable law, and that the laws of Rhode Island provide that capital gains remain in principal.

In testamentary trusts of personalty it is generally held that, on questions of administration, the law of

the situs of the trust is the law applicable thereto. However, questions of validity or disputes concerning interpretation or construction of the trust provisions are governed by the law of the domicile of testatrix. "The meaning of the words used in an instrument creating a trust of movables is, in the absence of controlling circumstances to the contrary, determined in accordance with usage at the domicil of the settlor of the trust at the time of the execution of the instrument which created it": Restatement, Conflict of Laws, §296.

The rule is further elaborated in §306 of the Restatement, Conflict of Laws, as follows: "The validity and effect of a will of movables is determined by the law of the state in which the deceased died domiciled": Fowler's Appeal, 125 Pa. 388; DeRenne's Estate, 15 Phila. 566, 12 W. N. C. 94.

Is the problem of the allocation of capital gains a problem of administration or one of validity and interpretation? On that question I conclude that the problem, as disclosed by this record at least, is one of validity and interpretation. To demonstrate: in paragraph 5(a) testatrix gave to Dr. Rice "the entire net income" from her estate, and in order to support his claim that he is entitled to receive a portion of the gains realized, Dr. Rice must contend that by interpretation, these gains are "net income" within the meaning of that phrase. A similar situation arose in the case of Bank of New York v. Shillito, 14 N.Y.S. 2d 458. At page 462, the court said:

"The remaining question for disposition is, should the stock dividends received by the plaintiff during the life of the life tenant in connection with the securities held as principal of the trust be allocated entirely to principal in accordance with the laws of Massachusetts or should they be apportioned between

principal and income in accordance with the laws of New York.

"Testator died domiciled in Massachusetts and his will was probated there, but by the will he appointed the plaintiff, a New York corporation as trustee and directed that the property comprising the corpus of the trust be turned over to the trustee. The situs of the trust is, therefore, New York. . . .

"When it comes to questions of administration, the laws of the State of New York will apply to such questions, but when it comes to questions of interpretation, or the distribution to be made under the will, the courts will apply the decisions and laws of the state of testator's domicile governing such interpretation and distribution. . . .

"The question for interpretation here is, what did the testator or settlor mean by the terms of 'net income' and 'principal' as used in the instrument creating the trust? These are questions involving the effect of a will and questions of distribution, hence, it is governed by the laws of the testator's domicile at the time of his death. . . .

"I decide that the laws of the State of Massachusetts should govern."

No Pennsylvania case has been cited as squarely in point as the Shillito case. That is, no Pennsylvania case dealing with this question of what law applies to interpretation of the language of the instrument. However, there is a line of cases in Pennsylvania holding that questions of validity are determined by the law of decedent's domicile: Fowler's Appeal, 125 Pa. 388; DeRenne's Estate, 15 Phila. 566, 12 W.N.C. 94; Hutchinson's Estate, 17 Dist. R. 248. In these cases there were Pennsylvania corporate fiduciaries and nonresident settlors or testators. In each instance it was held that the law of the creator's domicile was controlling.

While the basic question in the present case is one of interpretation, there is also a question of validity. Clause 5(d) of the will provides:

"With respect to stock dividends, stock allotments, rights to subscribe to additional stock or bonds or to take part in the refinancing of any corporation in which my estate already has an interest, I direct that the principal trust fund as it came into the hands of the trustees being duly conserved, such distribution shall be treated as income."

Here decedent tried to write her own "intact value" rule. As to stock dividends, she gave the excess over intact value to income. However, as to the excess of principal gains over intact value she was entirely silent, thereby creating at least a strong inference that she intended income to have no part of them. In Pennsylvania, as decided by this court in Wentz's Estate, 12 D. & C. 398, cited with approval in Maris' Estate, 301 Pa. 20, such a provision giving to principal what would be income under the intact value rule is invalid. Thus, there is a question of validity of a testamentary provision which under the Pennsylvania cases above cited must be decided under the laws of decedent's domicile where the provision would be valid.

This leads to still another reason for holding that Rhode Island law applies; namely, that there are indications in the will itself that decedent so intended. The provision just referred to is one of them. If Pennsylvania law were to apply there was no need for the provision dealing with stock dividends and the like. All that would have followed as a matter of law without such a provision. Furthermore, clause 7 of the will provides:

"Wherever herein I have left my property to my children and their issue, distribution shall be made upon the principle of representation, that is to say,

the issue of a deceased child shall take equally among themselves the deceased parent's share."

This clause would have been unnecessary under Pennsylvania law, which presumes a distribution per stirpes when there is a gift to children and issue: Mayhew's Estate, 307 Pa. 84. In Rhode Island, on the other hand, when this will was written the rule was the opposite and a per capita distribution resulted unless a per stirpes distribution clearly had been spelled out: Pearce v. Rickard, 18 R. I. 142, 26 Atl. 38; Rhode Island Hospital Trust Company v. Bridgham, 42 R. I. 161, 106 Atl. 149.

Counsel for Doctor Rice argues further, that questions of administration are determined by the law of the situs of the trust, citing comment (c) §298, of the Restatement, Conflict of Laws, which says: "If the testator appoints as trustee a trust company of another state, presumptively his intention is that the trust should be administered in the latter state; the trust will, therefore, be administered according to the law of the latter state."

I observe two reasons why this rule has no bearing here. In the first place, there is no trust company immediately involved, but, more importantly, the court, as indicated, does not regard the question before it as one of administration. Comment (*a*) §297 of the Restatement contains a list of illustrations of questions of administration, but the list does not include the question of what is "entire net income", nor do any of the cases cited by counsel for Doctor Rice. I cannot agree that anything as substantive as a determination of the meaning of "net income" is a mere question of administration. If it is, there would seem to be no situation to which §296 of the Restatement (which deals with the question of interpretation) could apply. In fact, Pennsylvania cases, as Warden Trust, 382 Pa. 311; Pew Trust, 362 Pa. 468, and

Crawford Estate, 362 Pa. 458, indicate that the intact value rule for the determination of income is so firmly entrenched in our substantive law that it seems incongruous to regard it as a mere matter of trust administration.

Doctor Rice points to several extrinsic circumstances which, he argues, warrant the conclusion that testatrix intended that Pennsylvania law should govern: (1) That Mrs. Rice was originally a Pennsylvanian; (2) that two of the trustees (her children) live in Pennsylvania; (3) the trust assets are physically located in Pennsylvania and managed in Pennsylvania; (4) that the will and codicils were prepared by a Philadelphia law firm; (5) that a substituted trustee, named in the will as a corporate fiduciary, is located in Pennsylvania.

The two trustees were undoubtedly selected because they were the children of testatrix and not because of their geographical residence. The fact that the trust assets are located out of the State of testatrix's domicile does not, of course, take away the power of the court of testatrix's domicile to regulate and control the validity, distribution and interpretation of the trust estate created by the will of a citizen of the domicile, which will has been proved and established in the probate court of the domicile. The legal existence of the trust takes effect from the proof of the will and the right of the trustees to receive the trust funds as derived from the decree of the probate court. Moreover, there is no irreconcilable difficulty in having the meaning and validity of a trust judged by the laws of one jurisdiction and its administration governed by the laws of another. Practical considerations render necessary the principle that problems concerning management of a trust are referable to the jurisdiction where the seat of its administration is located. Where, as here, questions of validity and interpretation, how-

ever, are stirred up in a judicial settlement of accounts, the tribunal having authority to confirm the administration must decide the question of construction and distribution according to the law of the foreign State whose law is applicable thereto: Wilmington Trust Company v. Wilmington Trust Company (Del.), 24 A. 2d 309. I conclude, therefore, that the law of Rhode Island is the applicable law.

Concerning the law of Rhode Island, a stipulation by counsel for all the parties was filed with the court. It provides as follows:

"1. Walter A. Edwards, if called as a witness for the accounting trustees in this proceeding, would testify as follows:

" 'I was graduated from the Harvard Law School in June, 1912, and admitted to the Rhode Island bar in May, 1913. During the entire period since my admission to the bar I have been engaged in the active practice of the law in Providence, Rhode Island, except for a period of about nine months during the First World War. During the entire period of my practice a substantial portion of my time has been devoted to matters relating to the administration of trusts and to questions of construction incidental thereo. I have also served as a trustee under numerous trusts, and at present am serving as sole trustee or as a cotrustee under fifteen trusts.

" 'The uniform practice in the administration of trusts in Rhode Island has been to treat the entire proceeds of the sale of stock as principal, and I have never heard of any objection having been made to this practice or of any suggestion that a portion of the proceeds should be treated as income payable to a life beneficiary if the stock is sold at a profit and the corporation, whose stock is sold, had accumulated earnings between the date of the acquisition of the stock

and the date of its sale. This is the practice which has been followed by Rhode Island Hospital Trust Company. It has also been followed in the trusts of which I have served as trustee. There has been no decision by the Rhode Island Supreme Court on the treatment to be accorded to gains realized by trustees on the sale of stock; but there have been cases in which the Rhode Island Superior Court has allowed trustees' accounts treating gains realized by trustees on the sale of stock as principal regardless of whether the corporation, whose stock was sold, had on hand at the time of the sale earnings accumulated since the acquisition of the stock.

" 'Moreover, there are clear indications that the Rhode Island Supreme Court would uphold the practice to which I have just referred. In *Slocum v. Ames*, 19 R. I. 401, 36 Atl. 1127 (1896), a trustee under a trust providing for the payment of the income to a life beneficiary had purchased land at foreclosure sale. Subsequently the mortgagor redeemed the land by paying to the trustee an amount equivalent to the purchase price plus interest thereon from the date of the sale to the date of redemption. Against the contention of the life beneficiary it was held that the entire amount received by the trustee constituted principal. In *Rhode Island Hospital Trust Co. v. Tucker*, 51 R. I. 507, 155 Atl. 661 (1931), in holding that stock dividends should be regarded as principal, the court said (at page 509):

" ' "The Pennsylvania rule, as applied to so-called stock dividends, is based upon the theory that the life tenant is entitled to all income of the corporation after the creation of the trust. It can hardly be called a sound theory which results in giving all profits to one class of beneficiaries and visits all losses upon another."

" 'Furthermore, the Rhode Island decisions do not follow the Pennsylvania decisions in inquiring into the

source of all corporate distributions so that there is not the same basis in Rhode Island for adopting the rule laid down in *Nirdlinger's Estate,* 290 Pa. 457, 139 Atl. 200 (1927), as there was in Pennsylvania. Stock dividends are treated as principal in Rhode Island. *Brown & Larned, Petitioners,* 14 R. I. 371 (1884), *Rhode Island Hospital Trust Co. v. Tucker,* supra. Any suggestion in *Rhode Island Hospital Trust Co. v. Peckham,* 42 R. I. 365, 107 Atl. 209 (1919), that the time of the receipt of the earnings capitalized by a stock dividend is to be looked into is expressly rejected in the opinion in *Rhode Island Hospital Trust Co. v. Tucker,* supra, at page 512. Rights to subscribe to stock and the proceeds of their sale are also regarded as principal in Rhode Island, *Greene v. Smith,* 17 R. I. 28, 19 Atl. 1081 (1890); *Rhode Island Hospital Trust Co. v. Tucker,* supra. It is only in the case of an extraordinary cash dividend that the source from which the dividend is paid is looked into as in *Rhode Island Hospital Trust Co. v. Peckham,* supra.'

"2. F. J. Hunt, if called as a witness for the accounting trustees in this proceeding, would testify as follows:

" 'I am an Executive Officer, to wit, Vice-President in charge of the Trust Department of the Rhode Island Hospital Trust Company, and have been in the employ of the Bank since 1916 and connected with the Trust Department since 1917. The Rhode Island Hospital Trust Company was founded in 1867 and has conducted a trust business since that time. It has handled a number of trusts, many of long duration, and is at the present time handling approximately two thousand (2,000) trusts with a book value of approximately $267,000,000. Unless there are specific provisions in a trust instrument, will, or deed directly to the contrary, it has been the practice of the Bank and

still is to credit capital gains made in any trust to the principal of the trust.' "

Counsel for Dr. Rice, however, take the view that despite this testimony Rhode Island has considered the question of apportionment of capital gains and has specifically directed that apportionment of the proceeds of the sale of stock in a Rhode Island trust should be credited to income referring to the supplemental opinion of the Supreme Court of Rhode Island in Rhode Island Hospital Trust Co. v. Tucker, 52 R. I. 277, 160 Atl. 465, and Industrial Trust Co. v. Harrison, 67 R. I. 131, 21 A. 2d 254. Those cases are inapposite. The former involves a question of apportionment of unproductive trust assets and, as indicated in Crawford Estate, supra, there is a wide difference between such problems and a problem of apportionment of capital gains. In the latter case no questions of sales and capital gains were involved.

For the foregoing reasons, I conclude that Rhode Island law applies and that there is no legal basis for Dr. Rice's claim to a portion of the capital gains.

*Allocation of 1954 Income Tax to Income*

The remaining objections raise the issue of whether income or principal should be charged with the trust income tax paid for 1954. I conclude that the accounting trustees did not err in charging this income tax to income.

The issue is complicated but can be stated in principle without becoming immersed in a morass of figures. In 1954 the trust received the following items of income, using that word in the income tax sense.

1. Tax exempt income from municipals $ 12,293.86

2. Interest, tax exempt, as it represented a recovery of interest previously paid without tax benefit .............. 121,479.46

| | |
|---|---|
| 3. Taxable interest and dividends .... | 395,733.26 |
| 4. Capital gains (100 percent) ...... | 402,207.36 |
| Total ........................... | $931,713.94 |

Against this income, there were certain exclusions and deductions as follows:

| | |
|---|---|
| (a) Item (1) excluded as nontaxable. | $ 12,293.86 |
| (b) Item (2) excluded as nontaxable. | 121,479.46 |
| (c) 50 percent of item (4) deductible | 201,103.68 |
| (d) Deduction for counsel fees charged to principal ..................... | 202,252.47 |
| (e) Deduction for counsel fees charged to income ........................ | 154,336.35 |
| Total ........................ | $691,465.82 |

Subtracting this total from the total of the income items leaves $240,248.12 of income upon which tax must be paid by someone. The question is whether it should be paid by principal or income as a matter of Pennsylvania trust law. For purely arbitrary reasons, the Internal Revenue Code of 1954 says that the tax on this sum (more correctly on $202,252.47 of it) is payable by the trust, rather than by the income beneficiary.

It must be remembered that this proceeding is one concerning the judicial settlement of accounts of fiduciaries being regulated, as it is, by the law of the situs of the trust. The Federal tax law does not determine the ultimate allocation of the taxes under Pennsylvania fiduciary law and, if we look at the first list of income figures set forth above, the equity of charging the trust tax to income is apparent. The first item, $12,293.86, was paid to income and was exempted by its nature. The second item, $121,479.46,

was also paid to income and, being exempt, cost no tax. Omitting the third item, for a moment, we note that $402,207.36 of capital gains stays in principal. The law exempts 50 percent of it, $201,102.68, and the deductible counsel fee of $202,252.47 was paid from it. Therefore, this transaction cannot be said to create any tax liability. Now, to return to the third item, $395,732.26, this was paid to the income beneficiary less counsel fee charged to income, namely, $154,336.35. In short, income received the net amount of about $240,000. This is the only identifiable money in the whole picture which causes any tax liability. When it is received by income, why should principal be expected to pay the tax on it? I think that it should not, and that it would be contrary to the equitable principles which are the touchstone of this court's traditional jurisdiction.

Prior to 1954, this case could not have arisen. Under prior Federal law, a trust was given a "distributable income" deduction for tax purposes, which was essentially the same in amount as the amount of income payable to the income beneficiary. The equitable allocation of tax between income and principal then resulted automatically. The income beneficiary paid his own tax on what was distributed to him, and the trust paid on that amount remaining in principal.

Under the Internal Revenue Code of 1954, however, the statute was revised to treat as "distributable income" the amount actually received by income, less expenses charged to principal. Whether by accident or design, the result is that, even where there are capital gains, the trust loses the benefit of a deduction for expenses charged to principal and the benefit of that deduction is given to income by statutory fiat. It may well be questioned whether Congress intended to

do so in all cases, but intentionally or not, the parties are in agreement that such is the result in the present case. The query as to Congress's intent arises from the comment in the Senate Finance Committee Report (Report No. 1622, 53rd Congress, 2nd Session, page 346), as follows:

". . . The effect of this limitation is to give the beneficiary [i.e. the income beneficiary] the benefit of certain statutory deductions, such as trustees' commissions allocable to corpus, which are allowed to a trust under the 1939 Code but which may be wasted because the trust distributes all its income and thus has deductions in excess of gross income. . . ."

The basic design seems to have been to prevent expenses charged to principal from going to waste. This portion of the change would have made sense, but why a principal expense should be given to income as an income tax deduction, when the trust could have used it, seems at least odd if not plainly inequitable.

In such a situation, I take the view that income should reimburse principal for the amount of tax which the trust was obliged to pay, namely, $100,551.84. And, even so, as has been called to the court's attention, the income beneficiary will profit substantially by the 1954 amendment to the Federal law because the trust tax rate is much less than his personal rate, and, whereas the trust has paid about $100,000 on the income thus received, tax free, by the income beneficiary, it is indicated that Dr. Rice's tax would have been at least $170,000 had it been taxed to him directly.

This case is the first, so far as this court is aware, to raise this precise question. One text writer, however, has considered the result to be inequitable if the

income beneficiary be not required to reimburse principal.[2]

While the author recommends an amendment of the Federal statute, I believe the situation can be worked out by the application of equitable principles as herein adopted. Both sides still will be benefitted more than if the statute is amended.

What we decided herein is not without precedent, at least by close analogy. In re Warms Estate, 140 N. Y. S. 2d 169, involves a situation where the executors of

---

[2] In an article by Austin Fleming in the December, 1955, issue of "Taxes" the following appears at page 893:

"One of the stated objectives in revising the sections on income taxation of estates and trusts was to prevent the wastage of deductions which occurred under old Section 162. Unless there were capital gains against which to apply them, any deductions for corpus expense were unusable and lost. For example, many trustees who charged a part of their fees to corpus found they had no income against which to offset these deductions.

"To achieve this objective, the drafters of the new sections devised a new income concept called 'distributable net income' which in section 643(a) is defined as the 'taxable income' of the estate or trust (with certain modifications) regardless of to whom taxed. Such taxable income is made the maximum measure of tax liability of the beneficiary.

"The effect is to give the income beneficiary the benefit of all deductions, including those charged to corpus, to the exclusion of the remainderman who himself might have a tax to pay and could use the deduction. For example, if the trustee had a net capital gain of $5,000, the trustee's fee of $5,000 charged to corpus, and dividend income of $10,000, the new sections have the effect of reducing the income beneficiary's taxable income by the amount of the corpus charge, while the trust as representative of the remainderman pays a tax on the capital gain undiminished by the deduction with which he has actually been charged. . . .

"Section 643(a) should be amended to provide that only the excess of deductions chargeable to corpus over items of income allocable to corpus shall be taken into account in computing distributable net income. This will prevent a wastage of such deductions without taking away from the remainderman deductions to which he is primarily entitled."

a decedent's estate used certain administration expenses as an income tax deduction which the Federal law would have permitted to be used as a Federal estate tax deduction. The saving of income tax was greater than the sacrifice of Federal estate tax. The court decided, on purely equitable principles, that income must reimburse principal in the amount of the Federal estate tax and, at page 171 said:

"The remainder interest is entitled to the benefits which would have resulted if the expense with which it is charged had been deducted on the estate tax return."

The principle that the burden of the tax should follow the benefit which gave rise to the tax is neither new nor without Pennsylvania analogy. It was held that a personal property tax, although prima facie a tax on principal because it is payable whether there is income or not, should be charged to income: Spangler v. York County, 13 Pa. 322, 328. There the court said the income beneficiaries ought ". . . in equity, good conscience, and by all analogy, to pay a tax which is directly based on the enjoyment of the subject of it".

The broad contention of counsel for Dr. Rice is based upon the following sentence of section 11(3) of the Principal and Income Act of July 3, 1947, P. L. 1283:

"Any tax levied by any authority, Federal, State or foreign, upon profit or gain defined as principal under the terms of subsection (2) of section 3 shall be paid out of principal notwithstanding said tax may be denominated a tax upon income by the taxing authority."

I consider this position inapposite, because it is not addressed to the present situation. This provision of the act was written in contemplation of the Internal Revenue Code of 1939, which contained no provision

comparable to that appearing in the Code of 1954, which gives rise to the difficulty here involved. Under the 1954 Code, it cannot be said here that the trust tax is the tax on gains. There are no gains to tax. They have been wiped out by the counsel fee paid from principal. The tax results because, by force of the Federal law, the benefit of that deduction is taken away from the trust and given to the income beneficiary: Principal and Income Act of July 3, 1947, P. L. 1283, sec. 11(2).

The attorney fees charged to principal by the accountants were $202,252.47. To the extent that these fees were not efficacious to save the trust income tax, there would be ground to charge them to income. Thus, the trust would get no reimbursement of its tax but it would get a reimbursement of the counsel fee which proves so beneficial to the income beneficiary from an income tax standpoint. I am convinced that the trust incurred a payment of $100,551.84 for the exclusive benefit of the income beneficiary, for which it should be reimbursed one way or another. The objections of Dr. Rice are, therefore, dismissed.

In view of the disposition of Dr Rice's objections, I need not decide whether there is a failure of consideration for the $170,000 paid from principal to the income beneficiary for the alleged reimbursement of Newport expenses.

The net ascertained balance of principal for distribution is awarded to Alexander Hamilton Rice, Eleanor Widener Dixon and George D. Widener, testamentary trustees, for the uses and purposes of the trust, and the net ascertained balance of income is awarded to Alexander Hamilton Rice.

The account is confirmed, and it is ordered and decreed that Eleanor Widener Dixon and George D. Widener, of the trustees for Alexander Hamilton Rice, forthwith pay the distributions herein awarded.

Counsel for accountants shall file a schedule of distribution in duplicate reflecting the conclusions herein reached.

And now, February 24, 1956, this adjudication is confirmed nisi.